Robert F. WILLIAMS, One Tai Chi Chang, Peking, China,

City Lights Books, Inc., a California Corporation, 261 Columbia Avenue, San Francisco, California,

Conrad J. Lynn, Skyview Acres, Pomona, New York,

and

Christopher Koch, Bennington College, Bennington, Vermont, Plaintiffs,

v.

Winton M. BLOUNT, the Postmaster General, Defendant.

Civ. A. No. 840–68.

United States District Court, District of Columbia.

June 17, 1970.

Sanford Jay Rosen, Atlanta, Ga., Michael E. Tigar, Los Angeles, Cal., Lawrence Speiser, Washington, D. C., Melvin L. Wulf, New York City, of counsel, for plaintiffs.

Benjamin C. Flannagan, Dept. of Justice, Washington, D. C., for defendant.

Before McGOWAN and ROBB, Circuit Judges, and ROBINSON, District Judge.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., District Judge:

This is a class action for an injunction restraining the Postmaster General[1] from applying the provisions of 18 U.S.C. §§ 957, 1461, 1717(a), 2387 (1964)[2] to the May 1967 issue of *The*

---

1. The Court, *sua sponte*, has substituted as defendant Postmaster General Blount for former Postmaster General Lawrence F. O'Brien, the original defendant in this action. Fed.R.Civ.P. 25(d) (1).

2. Section 957 provides in pertinent part:
 Whoever, in aid of any foreign government, knowingly and willfully possesses or controls any property or papers used or designed or intended for use in violating any penal statute, * * * shall be fined not more than $1,000 or imprisoned not more than ten years, or both.
 Section 1461 provides in pertinent part:
 Every * * * indecent * * * article is declared to be nonmailable and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.
 * * * * *
 The term "indecent" as used in this section includes matter of a character tending to incite arson, murder or assassination.

Section 2387 provides in pertinent part:
 (a) Whoever, with intent to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States:
 (1) advises, counsels, urges, or in any manner causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States; or
 (2) distributes or attempts to distribute any written or printed matter which advises, counsels, or urges insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States—
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.
 (b) For the purposes of this section, the term "military or naval forces of the

*Crusader* newsletter.[3] Because plaintiffs requested an injunction restraining the enforcement of several acts of Congress, a three-judge court was convened pursuant to 28 U.S.C. §§ 2282 and 2284 (1964).

At the time this action was commenced, *The Crusader* was written and published by Robert Williams, a plaintiff in this action, and was distributed to this and other countries from Peking, China. Among the recipients of the issue in question were plaintiffs Conrad J. Lynn, Christopher Koch and City Lights Books, Inc., a San Francisco bookstore which distributes copies of *The Crusader*. These plaintiffs represent a class of persons who regularly receive *The Crusader* and who allegedly wish to continue receiving it and sending it through the mails.

Purportedly acting under the authority of 18 U.S.C. §§ 957, 1461, 1717(a) and 2387 but relying primarily on the provision in § 1461 which provides for the nonmailability of matter tending to incite arson, murder or assassination, the Postmaster General on August 29, 1967, ordered the May 1967 issue banned from the mails. This action was taken after government officials, including President Lyndon B. Johnson, and certain private citizens submitted copies of the issue to postal officials for review.

■ Since the ban on the issue as an item of foreign mail continues, and the issue may not lawfully be mailed into this country, the case is not moot and the propriety of the Postmaster General's determination of non-mailability is before this Court. Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 178, 89 S.Ct. 347, 21 L. Ed.2d 325 (1969); Division 1287 of Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees of America v. Missouri, 374 U.S. 74, 83 S. Ct. 1657, 10 L.Ed.2d 763 (1963); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

The issue at the crux of this litigation is whether the Postmaster General may employ different, substantially abbreviated procedures, when dealing with foreign mail than those he must employ with domestic mail where nonmailability is concerned.

When domestic mail of doubtful mailability is brought to the attention of postal authorities, it is forwarded to the office of the General Counsel where the Assistant General Counsel makes an initial, tentative determination as to whether the matter transgresses a mailability law. If the Assistant General Counsel decides that the matter is nonmailable, a complaint is filed with the Docket Clerk of the Post Office Department. Once a complaint is filed, the Rules of Practice in Proceedings Relative to Mailability found in 39 C.F.R. § 953 (1969) and the provisions of the Administrative Procedure Act[4] apply. Door v. Donaldson, 90 U.S.App.D.C. 188, 195 F.2d 764 (1952). *See* Cutler, The Post Office Department and the Administrative Procedure Act, 47 Nw.U.L.Rev. 72 (1952); *cf.* Wong Yang Sung v. Mc-

---

United States" includes the Army of the United States, the Navy, Air Force, Marine Corps, Coast Guard, Naval Reserve, Marine Corps Reserve, and Coast Guard Reserve of the United States; and, when any merchant vessel is commissioned in the Navy or is in the service of the Army or the Navy, includes the master, officers, and crew of such vessel.

Section 1717 provides in pertinent part:
(a) Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book or oth-

er publication, matter or thing in violation of section * * * 957 * * * of this title or which contains any matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States is nonmailable and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

3. The May 1967 issue of The Crusader is the only issue of the newsletter under consideration here.

4. 5 U.S.C. § 551 *et seq.* (Supp. V 1969).

Grath, 339 U.S. 33, 70 S.Ct. 445, 94 L. Ed. 616 (1950).

The procedure established by 39 C.F. R. § 953 involves the forwarding of the complaint to the Docket Clerk of the Post Office Department who then serves the mailer with a copy of the complaint and sets the matter for hearing. A hearing examiner presides at the hearing, and the mailer has the right to introduce evidence and to be represented by counsel at all stages. At the conclusion of the hearing, each party may submit proposed findings of fact and conclusions of law. Following this submission, the hearing examiner enters an initial decision. Either party may appeal the decision to the Judicial Officer of the Post Office Department. If the Judicial Officer sustains the determination of nonmailability, the mailer may appeal for relief to an appropriate federal court. The Post Office Department may not, however, seek review of an unfavorable decision. If the Judicial Officer determines that the matter is non-mailable, it is detained by Post Office officials for a period of fifteen (15) days. During this period, the mailer may apply to withdraw the mail.

■ The Postmaster General may not resort to summary procedures to seize, detain, or impound domestic mail. Walker v. Popenoe, 80 U.S.App.D.C. 129, 149 F.2d 511, 513, 514 (Circuit Judge Arnold, concurring). *Cf.* Manual Enterprises v. Day, 370 U.S. 478, 518, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) (Brennan, J., concurring), Marcus v. Search Warrant, 367 U.S. 717, 731, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

When foreign mail of questionable mailability is brought to the attention of postal officials, a different procedure is followed. The mailability of foreign mail thought to violate the statutes at issue in this case is determined exclusively within the General Counsel's Office of the Post Office Department. The procedure which is followed consists of a memorandum opinion of mailability from the Assistant General Counsel of the Mailability Division to the General Counsel. The opinion cites the statutory and decisional law which the Assistant General Counsel feels controls the case. If that memorandum declares an item nonmailable, then postal officials may seize any copies of that item directed to domestic recipients from abroad.

Neither the senders nor the recipients participate in the process leading to the determination of mailability. Neither is informed that the Government suspects that the contents of the mail might violate certain penal statutes; neither is afforded an opportunity to be heard on the question of mailability. The Department's procedures include no regular provisions for administrative or judicial review of its decisions as they pertain to foreign mail.[5]

In the memorandum opinion which determined the nonmailability of the May 1967 *Crusader*, among the reasons ad-

---

5. The Post Office Department does, however, have a formal procedure regarding foreign mail which transgresses Title 39, U.S.Code §§ 4005 and 4006. Those sections apply when the foreign mailer is utilizing the United States Mails seeking remittances for matter advertised with false representations, and for lottery and obscene matter. This procedure involves notice of the proceedings to the mailer and the recipient and an opportunity for those parties to respond to the allegations of nonmailability.

When the Post Office is supplied with evidence that § 4005 or § 4006 may have been violated, the Assistant General Counsel obtains the necessary evidence for presentation to the General Counsel, and the General Counsel formally petitions the Judicial Officer for the Post Office Department for an order against the foreign mailer. This petition is composed of evidence of mailing, the claims made by the mailer, the articles involved, factual reasons why the General Counsel believes the mailer is acting in violation of § 4005, and supporting judicial and administrative case law. The order issued by the Judicial Officer directs postmasters to return to senders, appropriately marked, all mail matter directed to the cited foreign mailer. The same procedures are followed with obscene and lottery mail.

vanced in support of that determination were that

The subject publication advocates violence by Negroes in our cities and encourages Negroes, if they must serve in Vietnam, to sabotage operations in the field and among other things to murder their white fellow soldiers. * * * The advocacy of the publication in question, *The Crusader*, goes far beyond any appellation of propaganda or innuendo. * * * It is plainly stated that Negroes serving in Vietnam should murder their fellow white soldiers and sabotage the war machinery. It is thus clear that the publication is boldly advocating insubordination, disloyalty, refusal of duty, mutiny in violation of 18 U.S.C. § 2388(a) and is thus nonmailable under 18 U.S.C. § 1717(a).

The May 1967 issue has not been proceeded against as an item of domestic mail. No other issue of *The Crusader* has been declared nonmailable either as foreign or domestic mail.

The Postmaster General contends that the abbreviated procedure which he applied to the May 1967 *Crusader* is justified because a foreign sender has no rights under international law to compel delivery of his mail in the United States. According to the Postmaster General's theory, any rights of a foreign sender must flow from either an international agreement or from United States laws or regulations.

He contends that the carriage of foreign mail is governed by agreement among the contracting parties; and that the carriage of the May 1967 *Crusader* is regulated by the provisions of the Universal Postal Union Convention.[6]

Article 28, Section 1(d), of the Convention states that among the articles which may be prohibited in international mail are "articles whose import or circulation is prohibited in the country of destination." Section 2 of Article 28 provides that "[a]rticles containing the items mentioned in § 1 which have been erroneously accepted for mailing are handled in accordance with the legislation of the country of Administration which detects their presence." The Postmaster General notes that the convention contains no provision for a mailability hearing for any class of mail. And, in addition, he notes that hearings are not required by the Administrative Procedure Act or by any domestic statute governing the transit of foreign mail.

Finally, he contends that no useful purpose would be served by requiring a hearing at this stage in the proceedings because the May 1967 *Crusader* has already been conveyed in the mails and the mailer need not respond to any administrative citations.

■■ For the reasons which subsequently appear, we hold that the Fifth Amendment's due process clause requires that the same standards which the Postmaster General applies to domestic mail be applied to foreign mail between American citizens and that because of the Postmaster General's failure to apply those standards, his determination of the nonmailability of the May 1967 *Crusader* was improper. The determination as to mailability, in the first instance, is for the Postmaster General. In making that determination, however, he must employ procedures which are consistent with this Court's holding and until a proper determination of non-mailability is made, the May 1967 *Crusader* may be conveyed in the mails.

Any assumption of authority by the Postmaster General to intercept or to impound the mail which is not grounded on clear statutory authority is suspect. Justice Douglas stated that

The power of the Post Office Department to exclude material from the mails and to intercept mail addressed to a person or a business is a power that touches basic freedoms. It might even have the effect of a prior restraint on communications in violation of the First Amendment, or the inflic-

6. [1965] 2 U.S.T. 1291, 1347.

tion of punishment without due process of law which the Fifth and Sixth Amendments guarantee. * * * I mention the constitutional implications of the problem only to emphasize that the power to impound mail should not be lightly implied.

Stanard v. Olesen, 74 S.Ct. 768, 98 L.Ed. 1151 (Douglas, Circuit Justice, 1954). See Hannegan v. Esquire, Inc., 327 U.S. 146, 151, 66 S.Ct. 456, 90 L.Ed. 586 (1946); Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

The Postmaster General's supervisory powers over the mails flow from the power of Congress to determine what can be carried through the mails and what can be excluded. But the powers which Congress has over the mails, like those which the Postmaster General assumes, are, of course, subject to the limitations which the Constitution imposes. Burton v. United States, 202 U. S. 344, 371, 26 S.Ct. 688, 50 L.Ed. 1057 (1906).[7] In Ex parte Jackson, 96 U.S. 727, 732, 24 L.Ed. 877 (1877) the Court stated that

> The difficulty attending the subject arises, not from the want of power in Congress to prescribe regulations as to what shall constitute mail matter, but from the necessity of enforcing them consistently with rights reserved to the people of far greater importance than the transportation of the mail.

See United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704 (1921), Brandeis, J., dissenting, at 423, 41 S.Ct. 352, 65 L.Ed. 704.

No express authority exists for the power which the Postmaster General has assumed to summarily impound foreign mail. None of the statutes which, according to the Postmaster General, determine the nonmailability of *The Crusader* authorizes the summary treatment of foreign mail. No provision in the Code of Federal Regulations authorizes such treatment and the Postmaster has cited no administrative or judicial decision sanctioning such treatment.

Congressional hearings concerning legislative proposals to specifically grant to the Postmaster General the power to summarily impound mail indicate that Congress felt that he had no power to summarily impound any mail, foreign or domestic. Deputy Attorney General (now Justice) Byron R. White testified during the course of hearings before the Senate Post Office Committee on legislation which became Section 305 of the Postal Service and Federal Employees Salary Act of 1962. The bill authorized the Postmaster General to detain and deliver only upon the addressee's request unsealed foreign mailings of "Communist political propaganda." Deputy Attorney General White expressed serious doubts as to the constitutionality of a grant of such power to the Postmaster General, particularly in the absence of notice and a hearing. Hearings on H.R. 7927 Before the Committee on Post Office and Civil Service, 87th Cong., 2d Sess. 828, 831 (Postal Rate Revision of 1962).[8] During hearings on the same bill, Senator Clark stated that: "Any proposal which sets up a universal screening system for foreign mail, regardless of its exceptions, raises serious constitutional questions." U.S.Code Cong. and Ad. News, 87th Cong., 2d Sess. at p. 3076 (1962). Legislation introduced in Congress which would allow the Postmaster General to summarily impound mail shows no awareness that such pow-

---

7. *See* Lewis Publishing Co. v. Morgan, 229 U.S. 288, 301, 33 S.Ct. 867, 57 L.Ed. 1190 (1913); Pike v. Walker, 73 App.D. C. 289, 121 F.2d 37, 39 (1941); Doehla Greeting Cards Inc. v. Summerfield, 116 F.Supp. 68, 73 (D.D.C.1953).

8. § 305 was subsequently declared unconstitutional on the grounds that notifica-

tion to the Postmaster General by an addressee of his desire to receive the mail amounted to a premium on the exercise of his First Amendment rights. Lamont v. Postmaster General of the United States, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

er existed. See H.R.Rep.No.850, 83d Cong., 1st Sess. (1953); H.R.Rep.No. 1874, 82d Cong., 2d Sess. (1952); H.R. Rep. No. 2510, 82d Cong., 2d Sess. (1952).

A Post Office Department Manual published in 1939 stated that the Postmaster General had no power to summarily impound mail. U.S. Post Office Department Postal Decisions, 328 (1939) cited in Stanard v. Olesen, *supra,* 74 S. Ct. at 771, 98 L.Ed. 1151. A year later that same position was taken in a "Monograph of the Attorney General's Committee on Administrative Procedure, Post Office Department," S.Doc.No.186, 76th Cong., 3d Sess., 22 (1940). See 31 Ind.L.J. 257, 264, *et seq.* (1956).

■■ The Postmaster General's reliance on the Universal Postal Union Convention is misplaced. The Republic of China has not signed or adhered to the Convention, and therefore is not a party. Generally, for international agreements to be binding, an indication of assent by participating nations is required. Restatement (Second) of the Foreign Relations Laws of the United States § 122, Comment (a) (1965).[9] The Department of State has taken the position that our government accords " * * * rights under treaties and conventions only to countries which likewise have met the requirements of the particular instruments with respect to ratification or adherence. This position, it is believed, is in accordance with the customary and reasonable rule in regards to the interpretation of treaties." Secretary of State Cordell Hull to the British Ambassador (Lindsay) Oct. 6, 1939, MS Department of State, file 579.6L2/388. 5 Hackworth's Digest of International Law, 199–200.

But even if the Postmaster General's position that the terms of the Universal Postal Union govern the transit of the *Crusader* were accepted, it does not follow that Article 28, Section 1(d), authorizes the imposition of sanctions in a summary fashion.

■ A Postal Convention is neither a law nor a treaty since it has neither been passed by Congress nor ratified by the Senate. Four Packages of Cut Diamonds v. United States, 256 F. 305, 306 (2d Cir. 1919). A Convention has only the effect of an administrative regulation issued by the Postmaster General under authority of law. Standard Fruit and Steamship Co. v. United States, 103 Ct.Cl. 659, 682 (1946).

Article 28, Section 1(d), contains no standards of its own; it merely points to the domestic laws of member nations for standards of mailability. Since the Supreme Court has emphasized that the Postmaster General is not free to employ whatever procedures he chooses in dealing with prohibited matter, the interpretation of Article 28, Section 1(d), which would be most consistent with the Court's constitutional mandate would be that it directs him to domestic substantive and procedural law for standards of mailability. In Reid v. Covert, 354 U.S. 1, 16, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Court stated that " * * * no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." 354 U.S. at 16, 77 S.Ct. at 1230. Specifically with respect to 18 U.S.C. § 1461, the Supreme Court stated that that section does not authorize " * * * the Postmaster General to employ any process of his own to close the mails to matter which in his view falls within the ban of that section." Manual Enterprises v. Day, 370 U.S. 478, 519, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). *See also*

---

9. That section states: "Since an international agreement is made only by assent of the signatories, they are free to make any provision they desire as to the time and manner in which the agreement is to come into effect as binding upon them. If their intention is clearly indicated by the terms of the agreement, these terms control. If it is not, other manifestations of their intention, such as the negotiating history, diplomatic custom and the respective constitutions of the signatories, may be considered." See W. Bishop, International Law 135 (1962).

Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).[10]

The Postmaster General takes the position that the May 1967 *Crusader* can be impounded without a hearing because it is foreign mail. He takes that position in spite of the fact that Williams and the recipients of the issue of the newsletter are American citizens. The predicate of that position is that the place of mailing determines the extent of the constitutional protection to which the mail is entitled. Since the *Crusader* was mailed from abroad, it is for the Post Office purposes considered "foreign mail." It carries that distinction even though it was mailed by an American citizen, and directed to American citizens. The distinction persists after the mail has been imported and while it is physically located in this country, handled and carried by employees of the United States Postal Service, and brought to the attention of United States Postal officials.

The Postmaster General's distinction between foreign and domestic mail rests only on the fact that *The Crusader* was deposited for mailing outside of the United States and for part of its transit was moved by a foreign carrier. But that distinction, according to the Postmaster General, justifies the diminished constitutional protection to which he contends *The Crusader* is entitled.

We think that his failure to respect basic procedural rights cannot rest on such a distinction.[11]

 The constitutional protection to which mail between American citizens is entitled is not dependent on whether the item was mailed in this country or abroad. When the Postmaster General detains or impounds mail, of comparatively minor importance is the effect of that action on the piece of mail itself. What is of considerably greater importance is the effect of his actions on the constitutionally guaranteed free access to the mails by American citizens. That effect is the same regardless of whether the citizen finds himself here or abroad. Consequently, when the Postmaster General takes actions which might impair that access, those actions must comply with the Fifth Amendment's Due Process requirements. Pike v. Walker, 73 App.D.C. 289, 121 F.2d 37 (1941), Walker v. Popenoe, 80 U.S.App.D.C. 129, 149 F.2d 511 (1945).

 An American citizen does not forfeit his rights to freely use the mails or to be insulated from arbitrary or unfair actions by his Government simply because he finds himself outside of the country. Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

 The decision in *Reid* laid to rest any lingering doubts as to the complete applicability of the Constitution to extraterritorial actions by the United States Government. Justice Black stated that "At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights." 354 U.S. at 5, 77 S.Ct. at 1225. He inferred a persisting notion that only certain fundamental rights were guaranteed to Americans abroad.[12] "While it has been suggested

10. Serious doubts have always existed as to whether criminal statutes such as § 1461 could ever provide the authority for administrative sanctions. Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). In *Manual Enterprises*, three Justices (The Chief Justice, Justice Brennan and Justice Douglas) in a concurring opinion took the position that any procedure for censuring the mails short of a fully judicial one raised serious constitutional questions.

11. While it may well be true that mail directed from abroad by non-citizens is entitled to the same protections as mail which is directed by citizens, we do not reach that question here.

12. Justice Brown writing for a majority of the Court in Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) took the position that the Constitution did not control the extra-territorial actions of the government as they related to newly acquired territories which had not been expressly or impliedly

that only those rights which are 'fundamental' protect Americans abroad, we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of 'Thou shalt nots' which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments." 354 U.S. at 9, 77 S. Ct. at 1226.

Reid v. Covert dispels any doubts as to the Fifth Amendment's application to the actions of our government as they affect American citizens abroad. The principle announced there compels the conclusion that the Postmaster General violated Williams' Fifth Amendment rights when he impounded the May 1967 *Crusader* in a manner inconsistent with procedural due process.

Without reaching the question of whether the contents of the May 1967 *Crusader* were protected, we also hold that the Postmaster General's actions violated the Fifth Amendment rights of the recipients of the newsletter.

An important function of the protection which the First Amendment affords writers or speakers is that of guaranteeing to potential audiences the untrammelled access to all possible information, ideas and views. It is in furtherance of this function that courts have held that a putative listener has

rights which are entitled to judicial protection. In his concurring opinion in Lamont v. Postmaster General of the United States, 381 U.S. 301, 308, 85 S. Ct. 1493, 1497, 14 L.Ed.2d 398 (1965), Mr. Justice Brennan stated that "I think the right to receive publications is * * * a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *See also* Marsh v. Alabama, 326 U.S. 501, 508, 66 S.Ct. 276, 90 L.Ed. 265 (1945), Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) and Zeitlin v. Arnebergh, 59 Cal.2d 901, 31 Cal.Rptr. 800, 383 P.2d 152 (1953), cases where the First Amendment's protection of audience rights was recognized. *See* Schwartz, The Mails Must Not Go Through, Propaganda and Pornography, 11 U.C.L.A.L. Rev. 805, 824–25 (1964).

Since the recipients have a constitutional right to receive mail, the impounding of the *Crusader* imposes upon them a sanction as surely as it does upon Williams. As with Williams, that sanction may not be imposed if the Government fails to respect the basic procedural rights to which those recipients are similarly entitled.

---

incorporated into the Union by the Congress. He did concede, however, that "fundamental" constitutional rights applied everywhere, and the First Amendment's guarantees were fundamental. 182 U.S. at 177, 21 S.Ct. 770. Later decisions provided additional content to the concept of "fundamental rights"; but significantly, the Fifth Amendment's due process guarantee was among the first to be considered a "fundamental" right, see Chief Justice Taft's dicta in Balzac v. Porto Rico, 258 U.S. 298, 313, 42 S.Ct. 343, 66 L.Ed. 627 (1921). In Best v. United States, 184 F.2d 131, 138 (1st Cir. 1950), the Court applied the Fourth Amendment's search and seizure limita-

tions to actions of the government as they pertained to citizens abroad. In Eisentrager v. Forrestal, 84 U.S.App.D.C. 396, 174 F.2d 961 (D.C.Cir.1949) rev'd on other grounds sub. nom. Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255, our Court of Appeals held that the propriety of the incarceration of a foreign national abroad by United States authorities could be challenged by a writ of habeas corpus. In Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953), the Court held that the taking clause of the Fifth Amendment restricted governmental actions as they affected United States citizens abroad.