**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Gunnar WILLIAMS,**
**Defendant-Appellant.**

**No. 78–5413.**

United States Court of Appeals,
Fifth Circuit.

May 12, 1980.

Warren G. Jacobs, Miami, Fla., for defendant-appellant.

Patrick H. Sims, Mobile, Ala., for amicus curiae.

Wm. A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., Mervyn Hamburg, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.*

TJOFLAT, Circuit Judge:

This is a marijuana smuggling case, involving a search on the high seas. We have taken the case en banc to harmonize the discordant precedent that has evolved in the Fifth Circuit and to set aside the original panel's improper application in this nautical context of fourth amendment standards that courts have developed to test searches and seizures that occur ashore. Our analysis of the law should diminish the uncertainty that has burdened those charged with enforcing on the seas the laws of the United States.

* Judge Goldberg was a member of the en banc court under 28 U.S.C.A. § 46(c) and participated in the oral argument of the case en banc. Since that time he has taken senior status and therefore does not participate in this decision. Judge Charles Clark did not participate in the consideration or decision of this case.

## I

Frank Gunnar Williams was charged with conspiring to import marijuana in violation of 21 U.S.C. § 963 (1976). At the time of Williams's bench trial, he and the Government stipulated that the Government could call witnesses who would give the following account of the circumstances that led to his arrest. In January 1978, the PHGH, a 270-foot cargo vessel of Panamanian registry, took on a cargo of sulphur in Venezuela. The vessel's owner, Emanuel Karavias, came aboard before the vessel departed Venezuela. About that time, the ship's captain told the crew members that the crew would be paid in full as soon as the ship had picked up a load of cargo off the Colombian coast and delivered it somewhere in the Gulf of Mexico. Karavias departed the ship in Aruba, leaving behind special radio equipment. In Aruba, two Dominican nationals came aboard and took over operation of the radio equipment. The ship proceeded to the coast of Colombia and anchored offshore. As several smaller vessels came alongside the PHGH, all crew members except the two Dominicans, the captain, and two other officers were ordered below while the PHGH took on some cargo from the smaller vessels. The defendant, Williams, an American, came aboard as the loading began. When one of the crew members tried to go above to see what was happening on deck, he was turned back by Williams, who appeared to be armed.

On January 25, 1978, John Stevenson, a Drug Enforcement Administration (DEA) pilot, was flying a mission to spot vessels that might be involved in drug trafficking. He observed a cargo vessel anchored about one and one-half miles off the coast of Colombia and several smaller craft that were rendezvousing with the cargo vessel. He identified the suspect cargo vessel as the PIGH and reported his observations to the El Paso Intelligence Center of the DEA.

On January 30, 1976, the Coast Guard Cutter ACUSHNET, under the command of CDR A. C. Peck, sighted a vessel bearing the name PHGH in international waters about 100 miles east of the tip of the Yuca-tan Peninsula. On board the ACUSHNET was a list of suspect vessels that included Stevenson's description of the vessel that he had identified as the PIGH. Since the description matched the vessel under observation, Commander Peck contacted the El Paso DEA, which gave him information indicating that the PHGH and the PIGH were the same vessel.

When the ACUSHNET approached the PHGH, the PHGH hoisted a distress signal flag. By radio, the ACUSHNET asked the PHGH to state its origin, destination, cargo and reason for displaying a distress flag. The PHGH replied that she was enroute from Aruba to Mobile, Alabama, that she was carrying sulphur, and that she had a generator problem requiring no Coast Guard assistance. Although the PHGH flew no flag indicating the country of registration, the name "Panama" appeared on the stern, and the vessel was in fact registered in Panama.

The ACUSHNET maintained visual surveillance of the PHGH from the time of the initial sighting. At about 5:00 a. m. on February 1, crew members of the PHGH began waving clothes, toilet paper, and flashlights and giving hand signals. This activity continued for six hours. By 4:30 that afternoon the ship had stopped dead in the water. At that time, with no encouragement from the Coast Guard, a PHGH crewman dove overboard and swam to the ACUSHNET. The defecting crewman told the Coast Guard that there was "dirty business" on board the PHGH and complained about working conditions.

On February 2, Commander Peck, who had been continually in contact with Coast Guard authorities ashore, received a message from the State Department that the Panamanian Vice-Minister of Foreign Affairs had authorized the Coast Guard to stop, board, and search the PHGH, and, if contraband were discovered, to take the vessel to a United States port and hold those on board for criminal prosecution.

An armed Coast Guard party boarded the PHGH on February 2. One Coast Guardsman was instructed to check the vessel's

official registration number. Failing to find the number in the engine room, he proceeded to the cargo hold. When he opened the hatch, he discovered, atop the legitimate cargo of sulphur, several hundred brown paper packages, some of which were torn, revealing vegetable matter that proved to be marijuana. The total weight of the marijuana was 21,680 pounds.

The Coast Guard seized the vessel and took it to Mobile, where a DEA agent ascertained that certain documents found on the vessel indicated that the PHGH was bound for Mobile although the legitimate cargo was destined for Peru.

After the bench trial, the court found Williams guilty of conspiring to import marijuana. Williams appealed his conviction, contending: (1) that the district court lacked jurisdiction over Williams's person because his arrest was illegal; (2) that venue in the trial court was improper; (3) that the trial court lacked jurisdiction over the crime since no overt act occurred within the court's territorial jurisdiction; (4) that the United States lacked authority to board and search a foreign vessel on the high seas; and (5) that the search and seizure violated the fourth amendment.

II

On February 6, 1979, a panel of this court dismissed all of Williams's arguments and affirmed his conviction, *United States v. Williams*, 589 F.2d 210 (5th Cir. 1979). Although the en banc court subscribes to the panel's disposition of Williams's first four contentions and to the affirmance of the conviction, we must disagree with the panel's analysis of the fourth amendment issue.

The panel held that "before the government may order a foreign vessel to stop, . . . reasonable suspicion that criminal activity [is] afloat must be shown," *id.* at 214, and found that this fourth amendment standard had been amply met. Next, the panel considered whether the search that resulted in the discovery of the marijuana was unconstitutional and held that the search could not have violated any of Williams's fourth amendment rights, since "Williams has no legitimate expectation of privacy in the hold of a merchant vessel." *Id.*

As authority for the "reasonable suspicion" standard that it applied to the initial stopping (seizure)[1] of the PHGH on the high seas, the panel relied on *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and other cases involving the stopping and searching of possible wrongdoers on land. For reasons that we shall discuss below, we think that the panel should not have assumed that these cases apply automatically to a seizure on the high seas; nor should the panel have attempted to define in the abstract the minimal constitutional requirements governing such a seizure. We acknowledge, however, that the panel's errors were understandable ones because of the muddled state of our precedent.

For example, some Fifth Circuit cases have indicated that the fourth amendment does not prohibit the Coast Guard's stopping of American flag vessels for documentation or safety checks in the complete absence of suspicion of wrongdoing.[2] Fifth Circuit cases have held also that customs

---

1. The Coast Guard quite plainly "seized" the PHGH within the meaning of the fourth amendment when they stopped and boarded the vessel. Even the mere stopping of a vessel, without a boarding, is a fourth amendment "seizure" since the governmental action restrains the vessel's freedom to proceed. We intend the word "seizure," as we use it throughout this opinion, to refer to the stopping or the stopping and boarding of nautical vessels rather than to the expropriation of contraband or evidentiary material.

2. *See, e. g., United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc) (Coast Guard may stop and board a U. S. vessel in international waters and check its documentation and safety equipment without any suspicion of wrongdoing). 14 U.S.C. § 89(a) (1976), the statute authorizing such inspections, is constitutional. *Id.* at 1064. *United States v. Odom*, 526 F.2d 339, 341–42 (5th Cir. 1976); *United States v. One (1) 43 Foot Sailing Vessel*, 405 F.Supp. 879, 882 (S.D.Fla.1975), *aff'd*, 538 F.2d 694 (5th Cir. 1976) (per curiam).

officials may act without a modicum of suspicion when they board vessels, American or foreign, in customs waters for a routine documents check. *E. g., United States v. Whitaker,* 592 F.2d 826, 829 (5th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *United States v. Freeman,* 579 F.2d 942, 945 (5th Cir. 1978). On the other hand, *United States v. Kleinschmidt,* 596 F.2d 133, 135 (5th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979), in an alternative holding, applied the reasonable suspicion standard to customs officials' investigatory stop of a vessel in customs waters, implying that the question of the applicability of the standard to a stop on the high seas remains open.[3]

Several cases have approved warrantless searches of vessels on the high seas without considering whether there existed exigent circumstances and without suggesting that a warrant would ever be necessary to justify a search on the high seas. *United States v. Erwin,* 602 F.2d 1183 (5th Cir. 1979) (per curiam); *United States v. Postal,* 589 F.2d 862 (5th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978) (en banc); *United States v. Odom,* 526 F.2d 339 (5th Cir. 1976). None of these cases found it necessary to consider whether anything less than probable cause would justify the searches and seizures since probable cause was present in each case. *Kleinschmidt* held, however, that a warrantless search conducted following a routine documents check "could be constitutionally validated *only* by the existence of probable cause plus exigent circumstances." 596 F.2d at 136 (emphasis added). *See also United States v. Cadena,* 588 F.2d 100 (5th Cir. 1979) (per curiam) (on petition for rehearing).

By applying to searches on the high seas fourth amendment standards developed in the context of searches on land, cases such as *Kleinschmidt* and *Cadena* laid the basis for the panel's application of the land-based reasonable suspicion standard to the Coast Guard's stopping of a vessel in international waters. Conversely, the panel's adoption of the reasonable suspicion standard in this case reinforces the notion that the fourth amendment's search warrant requirement is also applicable at sea.

The ambiguity and inconsistency of the case law in this circuit has substantially impeded the counter-smuggling activities of the Coast Guard and the Customs Service. After *Kleinschmidt* and the panel opinion in the present case, federal officials cannot be certain what degree of suspicion, if any, they must have to stop *any* vessel, American or foreign. Although the panel's requirement of "reasonable suspicion that criminal activity may be afloat" is directed at the seizure of a foreign vessel, there is no suggestion that a foreign vessel is entitled to any greater fourth amendment protection than an American vessel.

An additional effect of the muddled case law is that once the Coast Guard or customs officers are aboard the vessel they cannot be sure what constitutional standard governs a search for contraband. Nor do they know for certain whether they must procure a search warrant before searching or, if a search warrant is necessary, what circumstances will excuse a search without one. Although several cases have now spoken of a warrant requirement, there is substantial doubt that the federal district courts have the authority to issue such a warrant.[4] Even if the courts have authori-

**3.** *Cf. United States v. Serrano,* 607 F.2d 1145 (5th Cir. 1979) (customs officials must have a reasonable suspicion of criminal activity before stopping a vessel on *inland* waters); *United States v. Williams,* 544 F.2d 807, 811 (5th Cir. 1977) (customs officers may board a private houseboat docked in an *inland* marina only if the officers have reasonable suspicion either that a customs violation is being committed aboard or that the boat has been in, or in

contact with other boats that have been in, international waters).

**4.** Fed.R.Crim.P. 41(a), which concerns authority to issue a search warrant, states:

A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state court of record within the district wherein the property is located, upon request

ty, there remains the question which court is to issue a particular warrant.[5] Moreover, the cases offer no guidance concerning how law enforcement officials are to obtain the warrant when the need to search a vessel arises far from shore, or the degree of specificity with which the warrant must define the area to be searched and the items to be sought.

## III

### A. Background

■■■ Most high seas seizures and searches are conducted by either the Coast Guard or the Customs Service. The Coast Guard's only statutory source of authority to seize and search vessels beyond the twelve-mile limit[6] is 14 U.S.C. § 89(a) (1976),[7] which also authorizes seizures and

searches *within* the twelve-mile limit. A second source of authority for seizures and searches of nautical vessels is 19 U.S.C. § 1581(a) (1976).[8] Section 1581(a) empowers both the Customs Service and the Coast Guard to board vessels and conduct customs searches, but only in customs waters—within the twelve-mile limit. Much of the conflict and ambiguity in the cases has been generated by the failure of courts: (a) to distinguish adequately the statutory authority for a boarding and search[9] and the constitutional limitations on that authority; or (b) to assess the impact of international law on the statutory authority and on the workings of the exclusionary rule.

Our analysis of the search and seizure issues in this case follows the pattern of the Supreme Court's analysis in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52

of a federal law enforcement officer or an attorney for the government.

This language obviously offers no guidance to a Coast Guardsman who seeks a warrant to search for contraband on a vessel at sea, far from any judicial district.

5. Were we to hold that district courts had the authority to issue warrants for searches on the high seas, there would remain the problem of which district court should issue the particular warrant. This problem would be more perplexing in a case where the law enforcement agency wishes to search a vessel at one of the innumerable points at sea that are equidistant from two or more districts of the same or different circuits.

6. As the en banc court observed in *United States v. Warren*, 578 F.2d at 1064 n. 4:

This 12-mile limit includes the territorial sea, which extends to three miles from the coast, and the contiguous zone, which extends from three to 12 miles from the coast. The United States exercises plenary power over the territorial sea, subject to the requirement that the passage of foreign vessels may not be interfered with unreasonably. *See* Carmichael, *At Sea with the Fourth Amendment*, 32 Miami L.Rev. 51, 56–57 (1977). The power of the United States over foreign vessels in the contiguous zone is limited to the preservation of specific interests, *e. g.*, the enforcement of customs and safety laws. *See id.* at 58.

The high seas lie seaward of the territorial sea and thus encompass the contiguous zone. In this opinion, we sometimes refer to the high seas beyond the contiguous zone as "international waters."

7. Section 89(a) empowers the Coast Guard to:

make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

8. Section 1581(a) provides:

Any officer of the customs [defined to include Coast Guard officers by 14 U.S.C. § 89(b) (1976) and 19 U.S.C. §§ 1401(i), 1709(b) (1976)] may at any time go on board of any vessel . . . at any place . . . within the customs waters [defined in 19 U.S.C. § 1401(j) (1976) as those waters within twelve miles of the Coast of the United States] . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

9. All of the high seas searches and seizures that have been considered in the Fifth Circuit were authorized by statute. The source of authority for such a search or seizure need not be statutory, however. *See* p. 1074 *infra.*

L.Ed.2d 617 (1977). The two defendants in *Ramsey* had moved to suppress heroin that a customs officer had discovered when he had searched envelopes that had been mailed from Thailand.[10] To decide whether the search, conducted without a warrant and in the absence of probable cause, violated the fourth amendment, the Court first inquired whether there was any statutory authorization for the search. Finding that the search had been authorized by a statute, 19 U.S.C. § 482 (1976), the Court then considered "whether the search, nevertheless violated the Constitution." *Id.* at 615, 97 S.Ct. at 1978. Relying primarily on the historical acceptance of the statute and similar "border search" statutes as "reasonable" within the ·meaning of the fourth amendment, the Court held the search constitutional. *Id.* at 619, 97 S.Ct. at 1980.

■ The two-part structure of the Supreme Court's analysis in *Ramsey* implies that a warrantless seizure or search in the complete absence of authority—a lawless governmental intrusion—is unconstitutional per se. If it were possible for an *unauthorized* seizure or search to be reasonable in a fourth amendment sense, then the presence or absence of authority would be merely a factor to be considered by the court in assessing reasonableness; instead, *Ramsey* poses the issue of authority as a threshold determination. In other words, if the Government can point to no authority for a challenged search or seizure, a court must conclude, without any further consideration, that the search or seizure was unconstitutional. On the other hand, if it can be established that the search or seizure was authorized, the court must then determine whether the search or seizure, as authorized, was reasonable within the meaning of the fourth amendment.

■■ The reasonableness of a warrantless, but authorized, search or seizure must be assessed through weighing the governmental policies served by the search or sei-zure against the personal interests that are adversely affected. The historical background of any given seizure or search is an important measure of the relative importance of the competing factors. Of course, the history and policy concerns that bear on the reasonableness of a particular seizure or search are the history of and policy concerns behind the source of the authority for the seizure or search. Therefore, after identifying 19 U.S.C. § 482 as the source of authority for the search of the envelopes, the *Ramsey* court looked to the historical background of the statute for guidance in answering the crucial question of the reasonableness of the search.

*Ramsey* indicates that the source of authority for a seizure or search need not be statutory, however. After making the threshold finding that the search was authorized by statute, the Court said: "[W]e need not decide whether Congress conceived the statute as a necessary precondition to the validity of the search or whether it was viewed, instead, as a limitation on otherwise existing authority of the Executive." *Id.* at 615, 97 S.Ct. at 1978. This statement implies that if the Court had found no *statutory* authority for the search, it would have considered whether there existed some other source of authority, such as executive authority.

### B. Outline of Analysis

■ In accordance with *Ramsey*, our analysis of the search and seizure issues in this case focuses first, in Part IV(A) of the opinion, on the question whether the Coast Guard had statutory authority to seize and search the PHGH. We conclude that the only statute that might have authorized the seizure is section 89(a), and that section 89(a) authorizes the Coast Guard to seize a foreign vessel in international waters if the Coast Guard first has a reasonable suspicion that those aboard the vessel are engaged in a conspiracy to smuggle contraband into the United States. Since grounds for such rea-

---

10. Since *Ramsey* involves a search on land, we do not consider *Ramsey*'s holdings automatically applicable in the present case. Rather, we follow *Ramsey*'s mode of analysis, which permits us to take into consideration the substantial differences between seizures and searches on land and those on the high seas.

sonable suspicion existed in the present case, section 89(a) authorized the seizure of the PHGH. The terms of section 89(a) impose no restrictions on the search of any vessel that has been seized pursuant to the statute. Therefore, section 89(a) also authorized the search of the PHGH's hold. We point out, however, that Panama's consent would have provided authorization for the search and seizure even in the absence of any statutory authority.

In Part IV(B) we address the second question of the *Ramsey* analysis—whether the seizure and search, although authorized, violated the fourth amendment. We conclude in Part IV(B)(1) that the section 89(a) *seizure* of the PHGH, on reasonable suspicion, was constitutional, but that reasonable suspicion may well not be the *minimum* standard that Congress constitutionally could have enacted to govern seizures like the one in this case. We also raise the possibility that the seizure would have satisfied the fourth amendment if it had been conducted under no authorization other than Panama's consent.

Part IV(B)(2) concerns the constitutionality of the Coast Guard's *search* of the hold of the PHGH. The discussion indicates that Williams probably had no fourth amendment privacy interest anywhere in the hold and that he certainly could have had no privacy interest in those sections of the hold that would be in the plain view of one conducting certain administrative checks. We assume, arguendo, that Williams *did* have some cognizable privacy interest in the area of the hold where the Coast Guard found the marijuana that enables him to raise a fourth amendment challenge to the search. We then conclude that the Coast Guard had reasonable grounds to suspect that there was contraband in the hold of the vessel and that a section 89(a) search of a cargo hold, supported by a reasonable suspicion that contraband was there, could

not have violated any of Williams's hypothetical fourth amendment rights. Implicit in this conclusion that the existence of reasonable suspicion satisfied the requirements of the fourth amendment is our holding that the search warrant requirement does not apply to searches like the one in this case. We reserve the question whether such a search, conducted pursuant to Panama's consent, alone, would have been constitutional.

Finally, in Part IV(C) of the opinion, we consider whether Panama's consent had any effect on Panama's rights under international law or any effect on the jurisdiction of United States federal courts to try this case. We hold, first, that Panama's consent constituted a waiver of any of Panama's rights under international law to challenge the Coast Guard's actions in this case and, second, that even if the seizure and search of the Panamanian flag vessel *had* violated international law, the violation would not deprive federal courts of jurisdiction or require the application of the exclusionary rule.

## IV

### A. Statutory Authority

■ Section 89(a) authorizes the Coast Guard to stop (seize) and board any vessel on the high seas, so long as the vessel is "subject to the jurisdiction, or to the operation of any law, of the United States." 14 U.S.C. § 89(a). The statute, which has been held constitutional, *United States v. One (1) 43 Foot Sailing Vessel*, 538 F.2d 694 (5th Cir. 1976) (per curiam), gives the Coast Guard plenary power to stop and board any American flag vessel anywhere on the high seas in the complete absence of suspicion of criminal activity. *United States v. Warren*, 578 F.2d at 1064; *United States v. Odom*, 526 F.2d at 341–42.[11]

---

11. The language of the statute indicates that the Coast Guard's authority is to extend beyond domestic waters: "[Section 89(a)] contemplates that vessels on the high seas will, under some circumstances, be subject to the 'jurisdiction, or to the operation of any law, of

the United States,' for it specifically provides for 'searches, seizures, and arrests upon the high seas *and* waters over which the United States has jurisdiction' (emphasis added)." *United States v. Cadena*, 585 F.2d 1252 at 1257 (5th Cir.)

 The statute is not limited on its face to American flag vessels, however. The jurisdiction of the United States embraces offenses having an effect within its sovereign territory, even though the acts constituting the offense occur outside the territory. *United States v. Cadena*, 585 F.2d at 1257. Since the United States has jurisdiction over such extraterritorial offenses, it follows that those who commit the offenses are "subject to . . . the operation of [the laws] of the United States." *Id.* at 1259 (quoting 14 U.S.C. § 89(a)). An extraterritorial conspiracy to violate a federal narcotics statute is an offense subject to the jurisdiction of the United States. *United States v. Postal*, 589 F.2d at 884; *United States v. Cadena*, 585 F.2d at 1259. Thus, a foreign vessel on the high seas becomes subject to the operation of the laws of the United States within the meaning of section 89(a) when those aboard are engaged in a conspiracy to violate federal narcotics statutes. *United States v. Postal*, 589 F.2d at 884. We have no doubt that a foreign vessel on the high seas would be subject to the operation of the laws of the United States if those aboard were engaged in a conspiracy to import illegally goods of *any* kind, not just narcotics or contraband.

 It would defeat the purpose of the statute to require the Coast Guard to be absolutely certain that those aboard a foreign vessel are in the process of violating federal law before seizing the vessel, since the Coast Guard could *never* have absolute certainty of such a fact. The statute obviously requires the Coast Guard to have *some* degree of cause, however; otherwise, the limiting language, "subject to the operation of the laws of the United States," would be inoperative. In order to give effect to the limiting language, we hold that the statute requires the Coast Guard to have at least a reasonable suspicion that a vessel is subject to the operation of this country's laws before seizing the vessel. Thus, if the Coast Guard has a reasonable suspicion that a foreign vessel in international waters is engaged in smuggling, the Coast Guard must necessarily have reasonable grounds for suspecting the vessel is subject to the operation of American laws; section 89(a) would, therefore, permit the seizure of the vessel.[12]

 The international law standard governing the seizure of foreign vessels in international waters supports our reading of section 89(a) to require "reasonable suspicion." Article 22 of the Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30. 1962) sets out exceptions to the general principle of noninterference on the high seas. The article permits the seizure of a vessel flying a foreign flag, or no flag, on the high seas where there is "*reasonable ground for suspecting*" that the ship is engaged in piracy or slave trading or that it is, in reality, the same nationality as the ship conducting the seizure.[13] Article 22 is a codification of the right of approach, a doctrine of international maritime common law. *See United States v. Postal*, 589 F.2d at 870.[14] Congress, in enacting section 89(a), created an

---

12. *United States v. Cadena*, 585 F.2d 1252, and *United States v. Postal*, 589 F.2d 862, also involved section 89(a) seizures of foreign vessels in international waters. Neither case explicitly defined the minimum degree of cause the statute requires the Coast Guard to have before conducting such a seizure. *Cadena* held that the Coast Guard "was authorized to stop the vessel by 14 U.S.C. § 89, and such a stop was justified by the existence of probable cause." 585 F.2d at 1263. Similarly, *Postal* found, "Here there was probable cause to believe the defendants were conspiring to smuggle contraband, and therefore the [seizure of the foreign flag vessel was] authorized by section 89(a)." 589 F.2d at 884. Since probable cause was present in both cases, it was not necessary for the panels to consider whether section 89(a) would have authorized such seizures on some lesser degree of suspicion.

13. We understand the requirement of "reasonable ground to suspect" to be equivalent to "reasonable suspicion," so we shall use the two formulations of the standard interchangeably.

14. The court noted in *Postal*, "the Convention on the High Seas, as its preamble states, is intended to be 'generally declaratory of established principles of international law.'" 589 F.2d at 878.

exception to the principle of noninterference that is analogous to the exceptions contained in article 22. That is, both article 22 and section 89(a) identify circumstances in which a foreign vessel in international waters is subject to seizure. Because article 22 embodies time-honored, internationally accepted principles of maritime common law, we think it appropriate to construe section 89(a), like article 22, to require that a seizure of a foreign vessel in international waters be founded on reasonable suspicion.

■ In the present case, therefore, the Coast Guard had *statutory* authority to seize the PHGH if there was reasonable cause to suspect that the vessel was being used to smuggle contraband into the United States.[15] The Coast Guard knew that a DEA pilot had observed the vessel in circumstances that suggested the loading of contraband. Although the vessel flew a distress flag, its captain rejected Coast Guard assistance. Crew members beckoned the Coast Guard for hours and one swam to the Coast Guard cutter and reported "dirty business" aboard the PHGH. We hold that, under these facts, grounds for reasonable suspicion undoubtedly existed and that section 89(a) therefore authorized the seizure and boarding.

Once the Coast Guard has a reasonable suspicion that a vessel is subject to the operation of federal law, it has, under section 89(a), unrestricted power to "make inquiries, examinations, inspections, searches, seizures, and arrests . . . ." 14 U.S.C. § 89(a). This broad authorization would appear to have permitted the Coast Guard,

lawfully aboard the PHGH, to have searched the hold without any suspicion that they would find contraband or evidence of criminal activity.

■ Even if the Coast Guard's seizure and search of the PHGH had not been within the authority granted by the statute, however, the Coast Guard's actions would have been authorized by Panama's consent, obtained by the State Department from the Panamanian Vice Minister of Foreign Affairs. *See* p. 1074, *supra.* Williams has not challenged the Government's apparent assumption that the State Department had the executive authority to order the Coast Guard to conduct a seizure and search pursuant to Panama's consent, although he does contend that the authority was not constitutional.

### B. Fourth Amendment Issues

■ The existence of authority for the seizure and the subsequent search of the PHGH does not necessarily establish that the Coast Guard's actions were within the bounds of the fourth amendment. *United States v. Ramsey,* 431 U.S. at 615, 97 S.Ct. at 1978; *United States v. Cortes,* 588 F.2d 106, 110 (5th Cir. 1979); *United States v. Cadena,* 585 F.2d at 1262. The fourth amendment proscribes searches and seizures that are unreasonable.[16] Several Fifth Circuit cases have held reasonable within the meaning of the fourth amendment the Coast Guard's section 89(a) authorization to stop and board, without a modicum of suspicion, American vessels outside of the

---

**15.** We agree with *Cadena* that section 89(a) is the sole *statutory* source of any Coast Guard authority to board a foreign vessel beyond the twelve-mile limit. The other possible statutory sources of authority plainly were not applicable:

> The anti-smuggling statute, 19 U.S.C. § 1701 permits the President to declare portions of the high seas to be customs enforcement areas. Customs enforcement under 19 U.S.C. § 1581 extends to jurisdictional limits defined in 19 U.S.C. § 1401(j)(12 miles or as permitted by treaty). The "special maritime and territorial jurisdiction of the United States" set forth in 18 U.S.C. § 7 extends to the high seas, but does not cover foreign vessels.

> None of these extends jurisdiction to a foreign vessel . . . over 200 miles from shore.

> *United States v. Cadena,* 585 F.2d at 1258–1259 (citations and footnotes omitted).

**16.** U.S.Const. Amend. IV provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

twelve-mile limit. *United States v. Erwin*, 602 F.2d 1183, 1184 (5th Cir. 1979) (per curiam); *United States v. Warren*, 578 F.2d at 1064–65; *see United States v. One (1) 43 Foot Sailing Vessel*, 538 F.2d 694. Certainly, a seizure and search of a foreign vessel is also subject to the fourth amendment.[17] Prior to the panel opinion in the present case, however, this court had not attempted to define specifically the minimum requirements of the fourth amendment in the context of a section 89(a) seizure and search of a foreign vessel beyond the twelve-mile limit.

In *Cadena*, DEA agents received a tip that one Albernaz wanted to charter a vessel to rendezvous with a freighter on the high seas and to take on a large cargo of marijuana. DEA undercover agents supplied Albernaz with the vessel, the Catchalot II. An agent aboard the Catchalot II notified the Coast Guard when the vessel approached the freighter. The Coast Guard boarded the freighter about two hundred miles off the coast of Florida and discovered fifty-four tons of marijuana in the holds. Since probable cause to seize the freighter and search its holds clearly existed, it was unnecessary for the court to consider whether the fourth amendment would have permitted the seizure and search on any lesser suspicion.[18] Similarly, in both *United States v. Postal*, 589 F.2d 890, and *United States v. Weinrich*, 586 F.2d 481, 494 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979), the court found that prior to boarding and searching a foreign vessel in international waters the Coast Guard had probable cause to believe that the vessel was being used to import contraband into the United States. Since the existence of probable cause unquestion-

ably satisfied the fourth amendment, the court was not called upon to define the minimal constitutional requirement.

The panel in the present case, on the other hand, *did* undertake to define the minimal degree of cause that the fourth amendment requires before a vessel may be seized. It held that "before the government may order a foreign vessel to stop, . . . reasonable suspicion that criminal activity is afloat must be shown" and that the standard had been "amply met." 589 F.2d at 214. The panel's language is extremely broad. It reaches foreign vessels in territorial waters or in the contiguous zone as well as those in international waters. Nor is the panel's holding restricted to section 89(a) seizures. It appears to mean that the fourth amendment requires reasonable suspicion of criminal activity even before the Coast Guard or Customs Service can seize a foreign vessel for a customs check. And, since there is no basis for assuming that the fourth amendment gives greater protection to foreign vessels than to American vessels in the context of customs seizures, a seizure of an American vessel for a customs check in the absence of reasonable suspicion of criminal activity presumably would be unconstitutional as well. In other words, the broad implication of the panel's opinion is that section 1581 and other sources of authority, *see*, pp. 1081–1083, *infra*, providing for the seizure of vessels without suspicion of criminal activity, are unconstitutional.

Since the panel's holding calls into question other Fifth Circuit cases that have held or implied that, even in the complete absence of suspicion of criminal activity, the fourth amendment does not prohibit sei-

---

17. *United States v. Cadena*, 585 F.2d at 1262 ("[The applicability of the fourth amendment] is not limited to domestic vessels or to our citizens; once we subject foreign vessels or aliens to criminal prosecution, they are entitled to the equal protection of all our laws, including the Fourth Amendment."); *United States v. Winter*, 509 F.2d 975, 989 n.45 (5th Cir.), *cert. denied sub nom. Parks v. United States*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

18. The *Cadena* panel suggested, however, that a search warrant would have been necessary had exigent circumstances not arisen. 585 F.2d at 1262. This notion that the search warrant clause of the fourth amendment is applicable to a search on the high seas implies that probable cause is also necessary, since a search warrant is not to issue "but upon probable cause." U.S.Const. Amend. IV. We disapprove *Cadena*'s endorsement of search warrants. *See* pp. 1086–1087, *infra*.

zures of vessels on the high seas, *see* pp. 1071–1072, *supra*, we find it necessary to confront directly the question of the constitutional limitations on the initial seizure of the PHGH. After approving the seizure of the PHGH, the panel declined to reach the issue of the constitutional standards governing the search of the hold of the PHGH because it found that Williams had no legitimate expectation of privacy in the hold. 589 F.2d at 214. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), which was decided after Williams's trial, governs the determination whether Williams had a legitimate expectation of privacy. Since the District Court rejected Williams's fourth amendment challenge perfunctorily, without determining the facts necessary for the panel or this court to apply the *Rakas* test, we are unable to say with certainty, as the panel did, that Williams had no cognizable fourth amendment interest in the hold. Rather than remand the case on this issue, after examining the constitutionality of the *seizure* we shall consider whether the Coast Guard's *search* for contraband met the fourth amendment's requirement of reasonableness.

### 1. The Seizure

The inapplicability of the land-based law that the panel invoked in its holding is most apparent in light of the following discussion of the history of the laws governing the seizure of nautical vessels. The historical inquiry also lays the basis for our assessment of the "reasonableness" of the Coast Guard's seizure of the PHGH.

This country's first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29, was enacted by the same Congress that, on September 23, 1789, proposed the Bill of Rights, including the fourth amendment, to the states for adoption, 1 Stat. 97. In *United States v. Ramsey*, the Supreme Court noted the significance of this historical background:

> Section 24 [of the Act of July 31, 1789] granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed

. . . ." This acknowledgement of plenary customs power was differentiated from the more limited power to enter and search "any particular dwelling-house, store, building, or other place . . . ." where a warrant upon "cause to suspect" was required. The historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest. This Court so concluded almost a century ago. In *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886), this Court observed:

> "The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. *As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment.*" (Emphasis supplied.)

431 U.S. at 616–17; 97 S.Ct. 1978–79 (footnote omitted).

We reiterate the *Ramsey* Court's suggestion that the 1789 custom statute's provision for seizing and searching vessels is "plenary" and that it is "reasonable." The statute indicates that the first Congress thought that the fourth amendment permitted the stopping and searching of vessels in the absence of any suspicion of criminal activity. The requirement that customs officials search a vessel only when they have "reason to suspect any goods, wares or merchandise subject to duty shall

be concealed" aboard means only that the customs officials had to suspect that a vessel to be seized and searched had on board, out of sight, dutiable items.[19] Of course, in 1789 most sea-going vessels were either merchant ships or warships. We think that it would have been reasonable for customs officials at that time to suspect that *any* merchant vessel contained dutiable goods; thus they had authority to stop and search any such vessel. That authority, under the *Ramsey* analysis, was constitutional.

Our conclusion that the 1789 statute permitted seizures and searches of vessels in the absence of suspicion of criminal activity is supported by the language of the federal statute, passed the following year, by the same Congress, at the time of the creation of the Revenue Cutter Service.[20] Section 31 of the act provided:

> That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters . . to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin, and every other part of a ship or vessel.

Ch. 35, § 31, 1 Stat. 164 (1790). Clearly, the authority to search a vessel pursuant to this statute did not depend on the existence of suspicion of any criminal activity. Enacted along with section 31 was section 48, which restated, almost verbatim, the 1789 inspection provision requiring "reason to suspect" that dutiable goods were "concealed" aboard the vessel to be searched. Ch. 35, § 48, 1 Stat. 170 (1790). We infer that

Congress considered the "reason to suspect" language in the inspection provision consistent with section 31's authorization to board vessels without cause.

The first Congress's notion that it would be "reasonable" for customs officials to board and search a vessel without suspecting criminal activity was justified by both long usage and practical necessity. In the latter eighteenth century, as now, there existed a general international principle of noninterference on the seas. Ever since the medieval idea of "sovereignty on the high seas," *see* Dickinson, *Jurisdiction at the Maritime Frontier*, 40 Harv.L.Rev. 1 (1926), had been abandoned, however, it had been settled that there were necessary exceptions to the principle of noninterference. As one commentator noted, "National security in the sixteenth and seventeenth centuries depended on the ability of a nation to control activities off its coast. This resulted in the concept of a territorial sea." Carmichael, *At Sea with the Fourth Amendment*, 32 U.Miami L.Rev. 51, 56 (1977). In *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804), decided soon after the enactment of the first customs statute, Chief Justice Marshall commented on the then well-understood exceptions to the principle of noninterference:

> [A nation's] power to secure itself from injury, may certainly be exercised beyond the limits of its territory. Upon this principle the right of a belligerent to search a neutral vessel on the high seas for contraband of war, is universally admitted, because the belligerent has a right to prevent the injury done to himself by the assistance intended for his enemy: so too a nation has a right to prohibit any commerce with its colonies. Any attempt to violate the laws made to

---

**19.** This is also the distinction drawn between criminal activity and concealment of dutiable goods in *The Atlantic*, 68 F.2d 8, 9 (2d Cir. 1933), where the court was construing 19 U.S.C. § 1581, the successor of the statute of 1789: "The authorization of section [1581] is to ascertain whether there are any dutiable articles concealed in the vessel; it is not to discover acts of criminality."

**20.** The Revenue Cutter Service was a forerunner of the United States Coast Guard, which was created in 1915 through a consolidation of the Revenue Cutter Service and the Life Saving Service. Carmichael, *At Sea with the Fourth Amendment*, 32 U.Miami L.Rev. 51, 65 (1977).

protect this right, is an injury to itself which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to.

*Id.* at 234. Given the history of maritime law and the practical impossibility of determining, without boarding and inspecting a vessel, whether the vessel might be violating customs laws, it is beyond question that the 1789 and 1790 acts were "reasonable and necessary" means to collect duties and to prevent smuggling.

■ Although the first Congress's construction of the fourth amendment is entitled to great weight, it does not necessarily settle the question of what is "reasonable" within the meaning of the fourth amendment today. Rather, the constitutionality of a particular search or seizure must be considered in light of the statute or other source of authority that presently permits the search or seizure.

Section 1581, the current customs statute, is the direct descendant of the 1789 statute. As the court observed in *Postal*, the provisions of section 1581 authorize within the twelve-mile limit "routine documentary checks without probable cause or articulable suspicion, and they apply equally to foreign and domestic vessels." 589 F.2d at 889. *Postal* approved the holding of *United States v. Freeman*, 579 F.2d 942 (5th Cir. 1978), that section 1581 boardings for the purpose of making documentary checks are both "statutorily authorized and constitutionally permissible." *United States v. Postal*, 589 F.2d at 889, quoting *United States v. Freeman*, 579 F.2d at 947. We agree with the *Freeman* court's observation that:

[T]here is a substantial distinction between a landlocked vehicle and a nautical vessel for Fourth Amendment purposes. First, the national frontiers of the oceans are much more difficult to police than the territorial boundaries of the land. The exact lines are difficult to discern and there is no limit to the numbers of fixed points of entry. It's simply not practical to stop and inspect every vessel at the actual border, an imaginary line on the seas. Finally, the brief and routine Customs detention prompted by the legitimate concerns of government for the safe and lawful operation of vessels intrudes only minimally into the privacy of seafarers.

[T]he authority embodied within § 1581 may be traced back to the commencement of the Republic when the First Congress statutorily granted Customs officials broad powers. The historical significance of the enactment of such Customs statutes by the same Congress which proposed the Fourth Amendment has been recognized by the Supreme Court. Clearly, members of the First Congress regarded neither seizures nor searches of the kind authorized by § 1581 "unreasonable" or embraced by the prohibition of the Fourth Amendment.

579 F.2d at 946–47 (citations and footnote omitted).

■ *Freeman* and *Postal* make two points that are relevant to the question of the constitutional limitations on the Coast Guard's power to seize and search foreign vessels beyond the twelve-mile limit. First, since a section 1581 seizure does not require any suspicion of criminal activity, it is clear that land-based "stop and frisk" law does not necessarily apply to stops of vessels on the seas. Second, since section 1581 constitutionally authorizes the seizure of both foreign and American vessels, it follows that foreign vessels do not possess some inherent quality that mandates that they receive either more or less fourth amendment protection than American vessels.

Similarly relevant to our inquiry are the cases holding that section 89(a) constitutionally authorizes the Coast Guard to stop American vessels beyond the twelve-mile

limit for routine safety and documentary checks. *E. g., United States v. Warren*, 578 F.2d 1058; *United States v. One (1) 43 Foot Sailing Vessel*, 538 F.2d 694; *United States v. Odom*, 526 F.2d 339. These cases reconfirm the notion that the fourth amendment does not necessarily require any sort of suspicion of criminal activity before a vessel may be stopped at sea; in addition, they imply that Congress's authority to enact statutes providing for "groundless" searches of vessels is not limited by the Constitution to United States customs waters.

Fifth Circuit cases have further indicated that the fourth amendment does not require that the Coast Guard's authority to seize a vessel on the high seas be derived from a statute.[21] One alternative source of authority is international law. For example, article 22 of the Convention on the High Seas, provides, in part, as follows:

1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her unless there is reasonable ground for suspecting:

(a) That the ship is engaged in piracy; or

(b) That the ship is engaged in the slave trade; or

(c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

2. In the cases provided for in subparagraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

As we have pointed out, *see* p. 1076 *supra*, article 22 is a codification of a tradi-

tional doctrine of international maritime law—that is, the right of approach or the right of visitation. *See United States v. Postal*, 589 F.2d at 870. The right to seize a vessel under the doctrine does not necessarily hinge on there being any suspicion of criminal activity. Subsection (c), the most frequently invoked part of article 22, requires only "reasonable ground" for suspecting that a seized ship is of the same nationality as the warship conducting the seizure. In *United States v. Cortes*, 588 F.2d 106 (5th Cir. 1979), the court held constitutional a boarding of a vessel pursuant to subsection (c):

Under a well-established rule of international law, known as the Right of Approach, the cutter had the authority to sail up to the unidentified vessel to ascertain her nationality. . . . [The Coast Guard] had justifiable suspicion that the [seized vessel] was attempting to conceal its identity and activities. Under these circumstances, the boarding of the vessel to search for registration papers or other identification was not unreasonable for Fourth Amendment purposes.

*Id.* at 110–11.

■ We agree with the *Cortes* panel that a boarding of a vessel pursuant to subsection (c) is constitutional despite the fact that the source of the Coast Guard's authority is a non-self-executing treaty rather than a statute. *See United States v. Postal*, 589 F.2d 862. Subsection (c) is reasonable, we think, because it advances an internationally recognized national interest—the policing of domestic flag vessels; because the provision is necessary if flagless vessels are to be policed at all; because the seizure permitted is but a limited intrusion in a maritime context where such intrusions are common and well accepted; and because of the sanction of history.

Another treaty providing for seizures of vessels without any suspicion of criminal activity—indeed, without suspicion of any kind whatever—was the Convention for the

---

21. The Supreme Court, in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), has also suggested that authority

for a search or seizure may be derived from sources other than statutes. *See* p. 1074 *supra*.

Prevention of Smuggling of Intoxicating Liquors, Jan. 23, 1924, United States-Great Britain, 43 Stat. 1761 art. II, (1):

His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

We have no doubt that the seizures authorized by this treaty were constitutional even though the treaty did not have the venerable history of the right of approach. Again, the treaty was drawn specifically to advance a valid interest of the United States—the prevention of smuggling of liquor; the treaty appeared to be necessary to enforce the prohibition laws; the authorized intrusion was reasonably limited; and the legitimacy of the provision was admitted by the sovereign whose vessels were to be searched.

■ Our analysis indicates that a foreign sovereign's less formal authorization of a minimally intrusive seizure of one of its ·vessels on the high seas for the purpose of permitting the United States to protect its interests would satisfy the fourth amendment even in the absence of statutory authority. Had there been no statutory provision for the seizure of the PHGH, Panama's consent, we think, may well have been a constitutionally adequate authorization for the seizure.

■ The factors bearing on the reasonableness of the seizure of a vessel on the high seas can be assessed only in light of the statute or other source of authority that is said to have permitted the seizure. Section 89(a), the source of authority for the Coast Guard's seizure of the PHGH, requires that the Coast Guard have a reasonable suspicion that the vessel is engaged, as in this case, in drug smuggling or some other activity making it subject to the operation of the laws of the United States. *See* pp. 1075–1076 *supra.* This provision of section 89(a) is reasonable within the meaning of the fourth amendment only if the governmental interests that the provision protects outweigh the private interests that are adversely affected. The identity and the substantiality of the governmental interests being advanced depend on which federal law the Coast Guard reasonably suspects a vessel to be subject to when it is seized. In the present case, the Coast Guard suspected that those aboard the PHGH were in the process of violating federal narcotics laws. The United States obviously has a vital interest in preventing the smuggling of illegal narcotics into the country and in apprehending those who may reasonably be suspected of violating the criminal narcotics laws.

■ Furthermore, the seizure of a nautical vessel is a very limited and foreseeable intrusion. Certainly, those aboard any vessel in international waters know that the vessel will be subject to a seizure for a customs check in the absence of any kind of suspicion under section 1581 any time the vessel ventures into American customs waters.[22] Such a seizure pursuant to section 1581 is constitutional for the reasons set out in *United States v. Freeman,* 579 F.2d at 946–47. Even those aboard a foreign vessel in *international* waters must expect the vessel to be seized pursuant to article 22 of the Convention on the High Seas when there exists a reasonable ground to suspect certain facts. We agree with *United States v. Cortes,* 588 F.2d at 110–11, that article 22 is reasonable within the meaning of the fourth amendment.

22. Of course it is always foreseeable that a vessel is subject to a similar customs seizure when it enters *any* nation's customs waters.

Section 89(a)'s provision permitting the seizure, in international waters, of a foreign vessel suspected to be involved in the violation of federal narcotics laws is at least as reasonable as the provisions for seizures of vessels set out in section 1581 and article 22. Under the facts of the present case, the reasonable suspicion standard of section 89(a) gave those aboard the PHGH the same degree of protection that article 22 gives those aboard vessels subject to seizure under that provision. We think that the governmental interests that are protected by seizures like the one in the present case are as important as the interests that article 22 seeks to protect, so it follows that the seizure of the PHGH is constitutional if a seizure pursuant to article 22 would be. Section 89(a) obviously gave greater protection to the personal interests of those aboard the PHGH than section 1581, which permits seizures without a modicum of suspicion, gives to the interests of those aboard vessels in customs waters. At the same time, this country's interest in seizing foreign vessels in international waters when the vessels are reasonably suspected to be involved in the violation of federal narcotics laws is clearly as strong as the interest in seizing unsuspicious vessels in customs waters for customs checks. Accordingly, we conclude that the Coast Guard's seizure of the PHGH easily satisfied the fourth amendment's requirement of "reasonableness."

The existence of several sources of authority—like section 1581 and the prohibition-era treaty with Great Britain—that provide for seizures of vessels in the complete absence of suspicion of criminal activity suggests that Congress might constitutionally provide for the seizure of foreign vessels in *international* waters on even less than "reasonable suspicion." It is not possible, however, for a court to set the parameters of reasonableness in the abstract, as the panel did in this case when it declared that reasonable suspicion is the minimum cause that will justify the seizure of a vessel.

Any time Congress or a foreign sovereign authorizes a warrantless seizure of a vessel, the courts, in applying the exclusionary rule, will be called upon to look to the terms and to the history of the authority to judge its constitutionality. In making this judgment a court will use the "reasonableness" standard, which applies to land and sea. But, contrary to the panel's suggestion, the substantial differences between a vessel and a landlocked vehicle, see *Freeman*, 579 F.2d at 946, building, or person preclude any assumption that the cases defining what is reasonable on land automatically control the question of what is reasonable on the high seas.

### 2. The Search

The panel disposed of Williams's challenge to the Coast Guard's search of the hold of the PHGH as follows:

> We hold that Williams has no legitimate expectation of privacy in the hold of a merchant vessel. The cargo of a merchant vessel is subject to inspection when it leaves a port and when it returns to a port. Certainly, no crew member could assert a privacy interest in a cargo area subject to these inspections.

*United States v. Williams*, 589 F.2d at 214.

We agree with the panel's suggestion that a mere crew member could have no privacy interest in the hold of a cargo vessel. The record does not support the panel's assumption that Williams was only a crewman, however. Williams was not on board the PHGH until the vessel took on its cargo of marijuana. During the loading, Williams stood guard, preventing members of the crew from observing the loading. We think it conceivable that Williams had some property interest in the vessel, the marijuana, or both; the record does not address these points. Because the analysis of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, which was decided after Williams's conviction, may leave open the possibility that the owner of a vessel or of the vessel's cargo may have some privacy interest in the hold of the vessel, Williams's contention that he has a privacy interest in

the hold could not be disposed of without first remanding the case to permit Williams to introduce evidence concerning his relationship to the PHGH and to the marijuana. We decline to remand the case on this issue, however, because we think it clear that even if Williams could demonstrate that he had a fourth amendment interest, the search could not have violated his fourth amendment rights.

The observations of Stevenson, the DEA pilot, gave the Coast Guard reason to believe that contraband had been loaded onto the PHGH near the coast of Colombia. The report that several smaller vessels had been involved in the loading, combined with the common knowledge that the usual contraband exported from Colombia is marijuana, suggested that the PHGH had been taking on relatively large quantities of marijuana, which is usually shipped in bales. The suspicious behavior of the vessel and the crew just before the Coast Guard's boarding indicated that the vessel was probably engaged in smuggling and that contraband might still be on board. The hold was the logical place for the Coast Guard to seek contraband of the sort and quantity they suspected. We have no doubt that these facts provide grounds for at least a reasonable suspicion that the PHGH carried contraband in its hold.

■ In our discussion of the Coast Guard's statutory authority, we held that section 89(a) provides for searches of vessels in the complete absence of suspicion that contraband or evidence of criminal conduct will be found in the particular place to be searched. Therefore, section 89(a) clearly authorized the search of the PHGH's hold where the Coast Guard reasonably suspected they would find contraband. As *United States v. Ramsey*, 431 U.S. at 615, 97 S.Ct. at 1978, teaches, our next inquiry is whether the search, nevertheless, violated the fourth amendment.

When the first customs statutes were enacted in 1789 and 1790, it may well have been reasonable, within the meaning of the fourth amendment, for Congress to have provided for stem-to-stern searches of for-eign vessels for evidence of criminal activity without a modicum of suspicion. As Chief Justice Marshall said in 1804, a nation has a right to prohibit certain commerce, and "[a]ny attempt to violate the laws made to protect this right, is an injury to itself, which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries . . . ." *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234, 2 L.Ed. 249. This language suggests that a nation's right to enforce its criminal laws on the high seas through searching foreign vessels is not limited by a requirement of any suspicion of criminal activity.

The character of nautical activities has changed substantially since Chief Justice Marshall's day. At the end of the eighteenth century almost all the vessels on the seas were either warships or cargo vessels that would be tiny by modern standards. Presently, however, the seas are teeming with pleasure vessels, ocean liners that carry passengers and little cargo, and huge merchant vessels with dozens of containers of cargo and multiple holds.

■ Despite these changed conditions, recent cases have assumed that the Coast Guard or customs officers may to this day constitutionally conduct a customs search of a vessel in *territorial* waters without any suspicion of criminal conduct. *See, e. g.*, *United States v. Ingham*, 502 F.2d 1287, 1291 (5th Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975). Extensive customs searches in territorial waters are universally thought to be legitimate; such searches protect an important national interest—the prevention of smuggling; smuggling activities would be almost impossible to detect without such searches; people crossing into a nation's territorial waters know they are likely to be searched; and vessels are searched only because they belong to a morally neutral class. *See United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). These factors suggest that the customs statutes

have satisfied the fourth amendment's requirement that the government's interest in enforcing its laws be balanced against the individual's interests in his dignity and privacy. *See id.*

 Equally "reasonable" within the meaning of the fourth amendment are the provisions of section 89(a) that permit the Coast Guard to conduct a limited administrative "search" of an American flag vessel pursuant to a safety or documentation check. Under that authority, the Coast Guard may, for example, go into the hold of the vessel to check the vessel's main-beam identification number. *See United States v. Odom*, 526 F.2d at 342. An intrusion by the Coast Guard into the hold of a *foreign* vessel pursuant to article 22 of the Convention on the High Seas would also satisfy the requirements of the fourth amendment. Article 22, section 1(c), permits a warship to seize a vessel on the high seas when there is reasonable ground for suspecting that the vessel is really of the same nationality as the warship. If any suspicion remains after the vessel's documents have been examined, article 22, section 2, would permit the warship to send a boarding party into the vessel's hold to check the main-beam identification number. Such a "search," like an administrative search pursuant to section 89(a), requires no suspicion that the intrusion into the hold will result in the discovery of any contraband or evidence of wrongdoing.[23]

 Because section 89(a) and article 22, section 2, constitutionally authorize the Coast Guard to enter the hold of a vessel to verify the vessel's identity in the complete absence of suspicion of criminal activity or of the presence of contraband, it follows that no one, not even a person with a pro-

prietary interest in the vessel and in the cargo, could conceivably have any legitimate expectation of privacy with regard to any objects that would be in the plain view (or smell) of a person conducting such an identification check. Therefore, even if Williams had *any* expectation of privacy in the hold of the PHGH, which we seriously doubt, his fourth amendment interests could not extend to the areas of the hold—or to the items in the hold—that would have been in the plain view of someone checking the identification number of the PHGH.[24] Our assumption, arguendo, that Williams *did* have a privacy interest in the hold amounts to an assumption that the marijuana would not have been plainly perceived in the course of an administrative search.

 The undoubted constitutionality of customs searches and administrative inspections in the absence of suspicion of criminal activity does not mean that the Coast Guard's power to search nautical vessels is today as unrestricted as when Marshall decided *Church.* We are assuming that there may be areas in the holds of vessels where someone could have a legitimate privacy interest. A section 89(a) search of those "private" areas of the hold of either an American or foreign vessel in international waters for the purpose of finding contraband or other evidence of criminal activity, when there is no reason to suspect that the items being sought will be found there, is today unreasonably intrusive. Unlike a routine customs search or administrative search, such a search is not morally neutral—the purpose of the search is to uncover evidence of *suspected* wrongdoing, and contemporary jurisprudence requires that criminal investigations be carefully constrained to protect the rights of criminal

---

**23.** Of course, a foreign vessel is also subject to seizure and administrative searches conducted by the country of its registration. Article 22, section 1(c), is founded on the assumption that every country is responsible for policing its own vessels.

**24.** A member of the Coast Guard boarding party discovered the marijuana on the PHGH when he opened a hatch leading to the vessel's

number one cargo hold. Although the coast guardsman purportedly was looking for the ship's official registration number, the record contains no evidence indicating that there was any likelihood that the identification number was in the number one hold. Therefore, we shall assume, arguendo, that the marijuana was not discovered in the course of a reasonable identification check.

suspects; there is less likelihood that a vessel in international waters is engaged in smuggling than one in customs waters; and a search of the extensive cargo space of a modern merchant vessel might constitute a significant interference with the operation of the vessel.

In light of these considerations, we conclude that the fourth amendment requires at least a reasonable suspicion that contraband or evidence of criminal activity will be found before the Coast Guard may, pursuant to section 89(a), search any "private" area of the *hold* of a vessel in international waters for the purpose of finding such items.[25] It follows, of course, that, in the context of such searches, the fourth amendment does *not* require a search warrant. Since search warrants may issue only upon probable cause, the warrant requirement could not be applicable to searches that are "reasonable" on any degree of cause less than probable cause.[26]

The Constitution mandates a less restrictive standard to govern searches on the high seas than searches on land because of the substantial and long-recognized differences between nautical vessels and vehicles and buildings on land. First, as the *Freeman* court observed, "the national frontiers of the oceans are much more difficult to police than the territorial boundaries of the land." *United States v. Freeman*, 579 F.2d at 946. Second, the extensive federal and international regulation of shipping and boating significantly limits the privacy that anyone might expect to have on the seas. As one commentator has observed, "Unlike a land bound citizen in constant contact with the government and police, the mobility and anonymity of persons aboard vessels at sea require that the government be able to exercise effective control when an opportunity is presented." Carmichael, *supra*, at 100. The laws and regulations governing nautical activities are sanctioned by a long history of acceptance.[27] Third, drug smuggling has grown into a massive problem. The Coast Guard is faced with "an enormous length of coastline and a vast expanse of ocean to police . . . . Technological changes have benefitted smugglers to a greater extent than the Coast Guard. Their vessels are capable of faster speeds and greater ranges and are equipped with detection systems as sophisticated as those the Coast Guard utilizes for law enforcement functions. Furthermore, smugglers' vessels now operate within a vast, indistinguishable sea of recreational boaters." Carmichael, *supra*, at 99–100. Without the ability to conduct warrantless searches on a suspicion less than probable cause, the Coast Guard's task may well be impossible. Fourth, the practical problems that would be created by requiring the Coast Guard to obtain a warrant to conduct a search on the high seas, *see* pp. 1072–1073 *supra* and n. 4—or by requiring the

---

**25.** Because maritime activities are pervasively regulated, and because a number of the regulatory laws permit government officials to enter the holds of vessels, nine judges of this court would hold that there is no legitimate privacy interest in any part of a vessel's hold. Those nine judges—Coleman, Brown, Ainsworth, Roney, Gee, Tjoflat, Hill, Vance, and Reavley—join this part of the opinion adopting the reasonable suspicion standard in order to achieve a majority.

**26.** We do not consider at this time what minimal degree of cause might be deemed reasonable under the fourth amendment to test searches of living quarters or personal effects, such as footlockers, aboard vessels.

**27.** In *United States v. Ingham*, 502 F.2d 1287, 1290 n. 4, (5th Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975), the court noted "a few" of the statutes dealing specifically with vessels and their entry for revenue and customs purposes:

> 19 U.S.C. § 282 (foreign-purchased merchandise to be used on the vessel); 19 U.S.C. § 1431 (manifest on board to indicate a ship); 19 U.S.C. § 1433 (report of arrival of vessel); 19 U.S.C. § 1434 (entry of American vessels); 19 U.S.C. § 1436 (failure to report entry of vessel); 19 U.S.C. § 1460 (failure to file manifest); 19 U.S.C. § 1467 (special inspection, examination, and search of vessel); 19 U.S.C. § 1485 (consignee declaration of goods on entry); 19 U.S.C. § 1581 (boarding of vessels); 19 U.S.C. § 1701 (defines customs enforcement area and applies to hovering vessels); 19 U.S.C. § 1706 (importation in vessels under 30 tons); 19 U.S.C. § 1709 (definition of customs vessel).

Government to litigate the issue of "exigent circumstances" in every case where there is a warrantless search—will likely eviscerate the Coast Guard's ability to combat drug smuggling. Finally, it is manifest that the Congress that enacted the first customs statute and proposed for ratification the fourth amendment did not intend the fourth amendment warrant requirement to be applicable on the seas. It is ludicrous to suppose that the 1790 Congress could have expected revenue cutters, which were sailing vessels, to sail back to land in quest of a search warrant whenever probable cause arose to search a vessel on the high seas for contraband. This is confirmed by the first customs statute, which, as the *Ramsey* court has pointed out, differentiated "plenary customs power . . . from the more limited power to enter and search 'any particular dwelling-house, store, building, or other place . . . ' where a warrant

upon 'cause to suspect' was required." *United States v. Ramsey*, 431 U.S. at 616, 97 S.Ct. at 1978–79.[28]

We have concluded that "reasonable suspicion" is the appropriate fourth amendment standard by which to judge section 89(a) searches of the "private" areas—if there can be such areas—of the holds of vessels in international waters conducted for the purpose of discovering contraband or evidence of criminal activity.[29] It is appropriate because the standard reflects a reasonable balancing of the government's interest in enforcing its criminal laws and the individual's interest in his dignity and privacy, *see United States v. Stanley*, 545 F.2d at 667, giving weight to the special problems of law enforcement, *see Ker v. California*, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) and to the highly regulated nature of shipping and boating.[30]

**28.** *See Carroll v. United States*, 267 U.S. 132, 151, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925), where the Court said:

Thus contemporaneously with the adoption of the Fourth Amendment we find in the First Congress, and in the following Second and Fourth Congresses, a difference made as to the necessity for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of reach of a search warrant.

**29.** As we point out on page 1077 of this opinion, Panama's consent was an alternative source of authority for the search of the PHGH. To determine whether a search pursuant to the consent would have been constitutional in the absence of section 89(a), we would have to assess the reasonableness of the consent in light of its purpose and "history." *See* pp. 1073–1074 & 1075 *supra*. Although the record indicates that Panama knew that the Coast Guard had reasonable grounds to suspect that the PHGH was carrying contraband in its hold, the record is silent about the history of such international agreements between Panama and the United States or between any other countries. Therefore, we deem it improper for us to resolve the question at this time.

**30.** Our analysis does not imply that the reasonable suspicion test would also govern a *customs* search of a vessel within the 12-mile limit. We held in *United States v. Ingham*, 502 F.2d at 1291, that customs officers may, pursuant to

section 1581, conduct a customs search of a vessel newly arrived in *territorial* waters without a modicum of suspicion of criminal activity. The language of section 1581, *see* p. 1073 *supra*, permits customs searches *anywhere* in customs waters, not only in territorial waters. We think that the factors that support a customs search without suspicion in territorial waters—substantial national interests, necessity, decreased expectations of privacy, and moral neutrality, *see* pp. 1085–1086 *supra*—would also permit customs searches within the contiguous zone, *see* n. 6 *supra*, when less cause than reasonable suspicion exists. *See* Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 735 (1980). If it is determined that customs searches without suspicion in the contiguous zone *are* constitutional, we cannot conceive that *anyone* on a vessel within the twelve-mile limit would have a legitimate expectation of privacy. The mere existence of the statutory language, even in the absence of such a holding, might diminish a person's expectation of privacy in customs waters. Although it is not now appropriate for us to resolve the question of what minimal cause the fourth amendment requires in the context of customs searches in the contiguous zone, we are certain that the distinctions between vessels on the high seas and vehicles or buildings on land would justify a reasonableness test that is substantially less restrictive than "probable cause." *United States v. Freeman*, 579 F.2d at 948, concluded that the Customs Service's search of a vessel in the contiguous zone was

■ The historical and international acceptance of the reasonable suspicion standard as a touchstone for judging searches at sea confirms its aptness. For example, the 1924 treaty with Great Britain, the Convention for the Prevention of Smuggling of Intoxicating Liquors, see pp. 1082–1083 supra, provided that Britain would not object to the boarding of British flag vessels by United States officials, without any suspicion of criminal activity, for the purpose of questioning those on board and examining the ships' papers to determine whether the vessels were engaged in smuggling liquor. When the inquiries and document examinations gave rise to "a reasonable ground for suspicion," the vessels could be searched. Similarly, the right of approach, codified in article 22 of the Convention on the High Seas, see p. 1082 supra, permits a search of a foreign flag vessel, when after the ship's documents have been inspected, a "suspicion remains" that the ship is engaged in piracy or slaving, or that it is, in reality, of the same nationality as the warship that has seized it.[31]

We have held that the Coast Guard undoubtedly had grounds for a reasonable suspicion that they would find contraband in the hold of the PHGH. Therefore, the search satisfied the requirements of the fourth amendment.

C. The Effect of Panama's Consent

■ Although the approbation of international law is a factor suggesting that a search or seizure is reasonable within the meaning of the fourth amendment, a search or seizure that violates international law may yet be both constitutional and permissible under the laws of the United States. For example, in United States v. Postal, where the Coast Guard had boarded and searched, with probable cause, a Grand Cayman vessel in international waters, the court considered whether the seizure and search had violated the Convention on the High Seas, to which the Grand Cayman Islands and the United States were parties. Since the Coast Guard's actions could not be justified under the right of approach codified in article 22 or within the hot pursuit provisions of article 23, the boarding and search had violated the article 6 principle that, "Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas." 589 F.2d at 869, 873. Postal held that the violation of a treaty provision like article 6 that is not self-executing did not deprive the United States courts of jurisdiction. Id. at 884. Nor did the article 6 violation affect the Coast Guard's statutory and constitutional authority to board the vessel. Id. at 885, 890. The rationale of this conclusion is the notion that a treaty that is not self-executing is generally an agreement governing the rights of sovereign nations, not the rights of individuals. Thus, as Chief Justice Marshall intimated in 1804, the major ramification of a nation's violation of international law is political: "If [a nation's actions in enforcing its laws] are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to." Church v. Hubbart, 6 U.S. (2 Cranch) at 234, 2 L.Ed. 249. If the aggrieved nation wishes to assert its rights under a treaty that the Coast Guard has violated, it may simply ask the United States Government to dismiss the prosecution. In order to preserve international harmony and the sancti-

---

"constitutionally permissible because of the combination of probable cause and the exigent circumstances attendant to a moving vessel." Unlike Freeman, which did not purport to define minimal fourth amendment requirements, United States v. Kleinschmidt, 596 F.2d 133, 136 (5th Cir. 1979), held that a customs search of a vessel apparently in territorial waters was constitutional only because of the existence of probable cause and exigent cir-

cumstances. The logic of our analysis obviously undermines any suggestion in Freeman, Kleinschmidt, or any other Fifth Circuit case that the fourth amendment mandates the application of the probable cause test and/or the warrant requirement to customs searches.

31. We construe the word "suspicion" as used in article 22, to mean "reasonable suspicion."

ty of its treaties, the Government would probably submit to such a request. In addition, as the court in *Cadena* pointed out, the treaty that has been violated might itself provide for reparation:

> The violation of international law, if any, may be redressed by other remedies and does not depend upon the granting of what amounts to an effective immunity from criminal prosecution to safeguard individuals against police or armed forces misconduct. Article 22 of the Convention, for example, specifies the right to compensation for damages suffered as a consequence of its violation . . . .

585 F.2d at 1261.

■ In the present case, Panama, the country of the PHGH's registration, was not a signatory to the Convention on the High Seas. 589 F.2d at 212 n. 1. Nevertheless, according to its preamble, the Convention is but a codification of established principles of international law. This suggests that a seizure of a Panamanian vessel on the High Seas may violate Panama's rights under the "common law" of the sea. Panama's consent to the search constituted a waiver of any such common law rights. It makes no difference that those aboard the PHGH were not parties to Panama's consent, since rights under international common law must belong to sovereign nations, not to individuals, just as treaty rights are the rights of the sovereign. Thus, Panama's waiver of its common law rights completely removed any international law concerns from the case.[32] Even if Panama had not consented to the seizure and search, however, the *Postal* analysis clearly indicates that a violation of international common law, which obviously could

not be "self-executing" in the sense that a treaty might be, would not affect the legality or constitutionality of the Coast Guard's actions and would not affect the court's jurisdiction. *United States v. Postal*, 589 U.S. at 884.

■ Finally, we reiterate *Cadena*'s suggestion that a violation of international law that is not also a violation of the Constitution would not call for the exclusionary rule to be applied to suppress any evidence obtained as a result of the violation. *United States v. Cadena*, 585 F.2d at 1261, see p. 1090 *supra*. We think that the deterrent purpose of the exclusionary rule is adequately served by the right of any foreign sovereign to object to any prosecution founded on a search or seizure that violated international law. *See Church v. Hubbart*, 6 U.S. (2 Cranch) at 234, see pp. 1080–1081 *supra*.

V

For the reasons we have stated, Williams's conviction for conspiring to import marijuana is

AFFIRMED.

RONEY, Circuit Judge, with whom GODBOLD, HILL, FAY, TATE and THOMAS A. CLARK join, specially concurring:

I concur in the result, but on different premises. Therefore, I write separately to set forth *seriatim* the propositions I think control this case, which involves the exclusionary rule as applied to contraband found on a foreign vessel on the high seas.[1]

The Coast Guard, as an arm of the United States military, has the statutory authority to do anything which the Government

---

**32.** Moreover, as we point out in Part IV(A), Panama's consent was a source of authority for the seizure and search of the PHGH. Because the record does not contain enough information about Panama's consent to permit us to engage in the sort of analysis mandated by *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617, we do not resolve the question whether the seizure and search would have been constitutional in the absence of any source of authority other than Panama's consent. *See* pp. 1082 and 1087, n. 29 *supra*.

**1.** *See Weeks v. United States*, 232 U.S. 383, 393–98, 34 S.Ct. 341, 344–46, 58 L.Ed. 652 (1914). The exclusionary rule is not based upon some notion that illegally obtained evidence is either untrustworthy or otherwise inadmissible. *See Stone v. Powell*, 428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1069 (1976). The Fourth Amendment, which protects an "invasion of [one's] indefeasible right of personal security, personal liberty and private property," *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886), would not give Williams the power to have excluded "relevant and probative evidence be-

can do in connection with the stop, search and seizure of any vessel, anywhere.[2] The Government's authority and the source of that authority depend upon the flag registry of the vessel and its location at the time of the stop.

The Government's authority to stop, board, inspect, and search a United States flag vessel, wherever located, is derived from the federal law governing vessels of United States registry.[3]

The source of authority over a foreign flag vessel in United States territorial waters is the federal law concerning vessels in territorial waters, as such authority might be modified by international law and treaties.[4]

The authority to search and seize vessels of United States registry, wherever they are, and foreign vessels within United States territorial waters, is subject to Fourth Amendment restraints.[5]

As to a foreign vessel on the high seas, however, the source of the Government's authority to stop, inquire, board, inspect, search and seize, and the restrictions or limitations on that authority, are found in international law.[6]

The Supreme Court has never held that the Fourth Amendment restricts Government action as to a foreign vessel on the high seas. I would hold it does not. Statements that the Fourth Amendment applies

cause it was seized from another in violation of the Fourth Amendment." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). The focus of this case should be upon the legitimate expectation of privacy for Frank Gunnar Williams, not some general notion concerning the legality of stopping, boarding and searching the foreign vessel on the high seas.

2. "The Coast Guard as established January 28, 1915, shall be a military service and a branch of the armed forces of the United States at all times. . . . . " 14 U.S.C.A. § 1. *See Maul v. United States*, 274 U.S. 501, 512–31, 47 S.Ct. 735, 739–46, 71 L.Ed. 1171 (1927) (Brandeis, J., concurring). "The Coast Guard shall enforce or assist in the enforcement of all applicable Federal laws on . . . the high seas . . ." 14 U.S.C.A. § 2. Section 89(a) of Title 14 affords blanket authority to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . . , for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, . . . . ." This statutory authority applies without distinction between domestic and foreign flag vessels.

3. *United States v. Lee*, 274 U.S. 559, 562–63, 47 S.Ct. 746, 747–48, 71 L.Ed. 1202 (1927); *Maul v. United States*, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927); *United States v. Warren*, 578 F.2d 1058, 1064–67 (5th Cir. 1978) (*en banc*); *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976).

4. *See, e. g., Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *Macridis v. United States (The Miss C. B.)*, 63 F.2d 639 (5th Cir. 1933); *Olson v. United States (The Atlantic)*, 68 F.2d 8 (2d Cir. 1933); *United States v. 5,870 Bags and 100 Kegs (The Ada M.)*, 67 F.2d 333 (2d Cir. 1933).

5. *See United States v. Kleinschmidt*, 596 F.2d 133 (5th Cir.) (United States vessel in territorial waters), *cert. denied*, —— U.S. ——, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *United States v. Conroy*, 589 F.2d 1258 (5th Cir.) (United States vessel in foreign waters), *cert. denied*, —— U.S. ——, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *United States v. Weinrich*, 586 F.2d 481 (5th Cir. 1978) (Fourth Amendment applied to seizure in territorial waters whether vessel is of United States or foreign registry), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (*en banc*) (United States vessel on high seas).

6. The high seas, under principles of international law, are subject to the jurisdiction of no nation, and are to be freely accessible to all commerce. Convention on the High Seas art. 2, *opened for signature* April 29, 1958, 13 U.S.T. 2313, 2318, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962); *see United States v. Postal*, 589 F.2d 862, 868–69 (5th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); Carmichael, *At Sea With the Fourth Amendment*, 32 U.Miami L.Rev. 51, 58 (1977). A ship is generally subject to the exclusive jurisdiction of the nation whose flag it flies. Convention on the High Seas art. 6.

There are, however, exceptions to this right of free accessibility. *See, e. g.*, Convention on the High Seas art. 22(1) (right of approach); Convention on the High Seas art. 23 (hot pursuit); 19 U.S.C.A. § 1701 (Anti-Smuggling Act).

to searches and seizures of foreign vessels on the high seas in *United States v. Cadena* and the majority opinion are not supported by the authority cited.[7]

Panama's consent forecloses any argument by this defendant that there was a

violation of international law.[8] Therefore we need not determine whether a United States Court would exclude evidence obtained in violation of international law.[9]

There is a difference between the rights accorded a vessel, and those which protect a

---

**7.** Before tackling the difficult constitutional questions the majority perceives this case raises, it asserts, "Certainly, a seizure and search of a foreign vessel [on the high seas] is . . . subject to the fourth amendment." Majority opinion at 1078. In support of this statement the majority cites *United States v. Cadena*, 585 F.2d 1252 (5th Cir. 1978). *Cadena* cites the following cases.

In *United States v. Winter*, 509 F.2d 975 (5th Cir.) *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) the issue was whether aliens were precluded from challenging the district court's jurisdiction over their person on the grounds their presence before the court had been unlawfully secured. *See Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). *See* 509 F.2d at 989 n. 45. The issue for decision in *Noro v. United States*, 148 F.2d 696 (5th Cir.), *cert. denied*, 326 U.S. 720, 66 S.Ct. 25, 90 L.Ed. 426 (1945), was whether enemy aliens residing in the United States were entitled to Fourth Amendment protection.

The issue in *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), was whether civilian dependents accompanying members of the armed forces in foreign countries during peacetime could be tried by military court-martial under the Uniform Code of Military Justice. The Court held such constitutional protection was available. The next case cited by *Cadena*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), involved an attack of the Alien Registration Act of 1940 by three resident aliens. Again, the question was whether aliens residing in the United States were entitled to invoke constitutional guarantees.

Finally, in *Williams v. Blount*, 314 F.Supp. 1356 (D.D.C.1970), the court considered whether the Postmaster General had the power to impound an issue of a newsletter published in Peking and sent to the United States. The Postmaster relied on a statute proscribing the mailability of matter tending to incite arson, murder or assassination. The court held the doctrine of *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), assures constitutional protection in cases involving extraterritorial actions by the United States Government, and held applicable to one of the defendants, an American citizen who was apparently the newsletter's publisher in Peking, the Fifth Amendment due process clause.

**8.** The majority opinion agrees with this premise at 1090. *Cf. Waits v. McGowan*, 516 F.2d 203, 208 & n. 9 (3d Cir. 1975) (In case of international extradition, protection available to extradited person exists primarily for benefit of asylum nation, precluding extradited person from raising violations of rights afforded by demanding nation); *United States v. Gengler*, 510 F.2d 62, 68 (2d Cir.) ("[A]bduction from another country violates international law when the offended state objects to the conduct."), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (citing *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974).

**9.** Cases involving violations of international law or treaties have generally focused upon the federal court's jurisdiction to hear the case. *See, e. g., Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927). The law of nations generally does not afford individuals remedies against violation of international law. *See Dreyfus v. Von Finck*, 534 F.2d 24, 30–31 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *United States v. Gengler*, 510 F.2d 62, 67 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *Kalmich v. Bruno*, 450 F.Supp. 227, 229 (W.D.Ill.1978); *Restatement (Second) of Foreign Relations Law of the United States* § 115, comment e (1962). We have previously suggested that violation of international principles by a searching authority would not necessarily call for invocation of the exclusionary rule or dismissal of the indictment "unless Fourth Amendment interest are violated." *United States v. Cadena*, 585 F.2d at 1261. The courts have generally exercised great restraint in dealing with matters involving our relations with foreign nations, deferring instead to the Executive Branch. *See United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966).

person.[10] Although the foreign vessel on the high seas has no constitutional protection against United States Government activity, Williams, as a United States citizen on a foreign ship, just as on foreign soil, does have constitutional rights against an unreasonable search and seizure by United States Government authorities.[11] This protection extends only to the areas in which he has a legitimate expectation of privacy, including his person, his cabin and his personal effects. None of these areas was searched. Although this area of privacy might extend to the hold of a small, private vessel, it would never encompass the cargo hold of a merchant vessel.[12]

In any event, because the stop, and the ensuing search for the ship's registration, were authorized under international law, the discovery of the marijuana while on that authorized mission gave the probable cause necessary to conduct the subsequent search within Fourth Amendment constraints.[13]

ALVIN B. RUBIN, Circuit Judge, with whom KRAVITCH, FRANK M. JOHNSON, Jr. and RANDALL join, concurring in the result:

However muddled our precedent, decision here might be quickly reached on accepted principles. Yet my brethren use this case as an opportunity to announce what appears to me to be an unprecedented and unwarranted interpretation of the fourth amendment, to discourse on the meaning of statutes not before us and to discuss principles of international law not here involved. The Constitution limits our jurisdiction to cases and controversies. I respectfully submit that the majority opinion ignores this limitation deliberately.

It is doubtful that Williams had standing to contest the validity of the search of the PHGH. The majority do not find that he did, but assume his standing in order to reach the issues they discuss. Even if he had a reasonable expectation of privacy, by the time the Coast Guard had been informed, in addition to what it already knew, that there was dirty business aboard the M/V PHGH, it had probable cause to stop, board and search the vessel. Moreover, circumstances were exigent even though the vessel was not moving; the PHGH might again get under way or efforts might be made to jettison its cargo. There was, therefore, no fourth amendment violation. Section 89(a) gave authority for stopping and searching the vessel. Panama's consent eradicated the basis for a motion to suppress based on international law.[1]

10. *Cf. Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("[T]he Fourth Amendment protects people, not places.").

11. *Reid v. Covert*, 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957) (plurality opinion by Black, J.).

12. The panel opinion in this case, although vacated by the Court's rehearing *en banc*, Fifth Circuit Rule 17, resolved this issue persuasively:

We hold that Williams has no legitimate expectation of privacy in the hold of a merchant vessel. The cargo of a merchant vessel is subject to inspection when it leaves a port and when it returns to a port. Certainly, no crew member could assert a privacy interest in a cargo area subject to these inspections. In the instant case, we are not dealing with a search of a living quarters but rather with a search of an area that is let for public hire. It is therefore plain to us that under the analysis approved by the Supreme Court in *Rakas* [*v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979)], as a matter of substantive fourth amendment law, the search of the vessel's hold did not violate any of Williams' rights.

*United States v. Williams*, 589 F.2d 210, 214 (5th Cir. 1979); *see Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979); *United States v. Vicknair*, 610 F.2d 372, 379–81 (5th Cir. 1980).

13. *United States v. Baker*, 609 F.2d 134, 140 (5th Cir. 1980); *United States v. Warren*, 578 F.2d 1058, 1065 (5th Cir. 1978) (*en banc*); *United States v. Odom*, 526 F.2d 339, 342 (5th Cir. 1976).

1. I would find Panama's consent sufficient because Panama is not a signatory of the Convention on the High Seas. Thus, any violation of the terms of that Convention here was a violation of international law and not of a treaty. It is a general principle of international law that "consent or acquiescence by the offended state waives any right it possessed, and heals any violation of international law." *United States*

The majority opinion is not content to deal with this case, but seeks to set a beacon on the seizures and searches area for the guidance of the Coast Guard, the Customs Service, District Judges and the bar. It also spreads light on what is permissible in territorial waters and the contiguous zone, although this case involves only international waters. In our supervisory role, we have authority to adopt procedural rules, *see United States v. Dunbar*, 611 F.2d 985 (5th Cir. 1980) (en banc). We have no power to promulgate substantive ones. To do so in a judicial opinion is, I respectfully submit, the rendition of advice, a role renounced for the federal courts only three years after the Constitution was adopted. *See* Letter from Chief Justice John Jay and the Associate Justices to President George Washington (August 8, 1793), *reprinted in* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 65–66 (2d ed. 1973). Therefore, while I concur in the result, I must differ with the use of this case to expound a mini-treatise on the subject of offshore law enforcement.

If the case involved only matters of lesser impact, I would stop here. Because I also differ profoundly with the majority concerning the correctness of their constitutional dicta, I state my differences and my reasons.[2]

*v. Gengler*, 510 F.2d 62, 67 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). *Cf. Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933) (where a seizure violates a treaty that is self-executing, government has no power to subject vessel or defendants on board to its laws); *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (same).

2. Respectfully, I also differ with the majority analysis of international law and the discussion of self-executing treaties. However, I discuss only our most serious difference, the constitutional question.

3. Although the principles the majority has set out for searches on the high seas and territorial waters seem to me obscure, I will set forth here what I regard as the salient points in their analysis. First, although the majority conclude that the seizure in this case was conducted pursuant to section 89(a), which they hold requires reasonable suspicion, they caution that

## I. THE FOURTH AMENDMENT AT SEA

"The Court that decided *Carroll v. United States*, [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), involving the stop and search of an automobile] sat during a period in our history when the Nation was confronted with a law enforcement problem of no small magnitude—the enforcement of the Prohibition laws. But that Court resisted the pressure of official expedience against the guarantee of the Fourth Amendment." *Almeida-Sanchez v. United States*, 413 U.S. 266, 274, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596 (1973). "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Id.* at 273, 93 S.Ct. at 2540, 37 L.Ed.2d at 603.

My brethren accept the premise that the protection of the fourth amendment does not end on the beaches or even at the three mile limit, but extends to the high seas. However, the opinion then denies that promise by holding in effect that any seizure or search of a vessel on the high seas is reasonable.[3] Several reasons are offered for distinguishing vessels from land vehicles

"reasonable suspicion may well not be the *minimum*" constitutional standard. They suggest, for example, that a foreign nation's consent to the seizure of a vessel registered with that nation may provide authority to the Coast Guard to seize the vessel without any suspicion at all. Second, the majority conclude that, because the warrant requirement does not extend to the high seas, probable cause is likewise unnecessary and a full search of a properly seized vessel can be conducted when there is a reasonable suspicion that the vessel is carrying contraband. Third, the majority determine that the *customs* statute, 19 U.S.C. § 1581, which authorizes searches and seizures within the territorial waters and the contiguous zone, provides a plenary power to search which is constitutional without any suspicion of criminal activity. Finally, they reaffirm the established rule that random stops and searches of American vessels on the high seas for "routine safety and document checks" are constitutional, *see United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc).

(and, inferentially, from planes): that drug smuggling has grown into a massive problem, that technological changes have benefited smugglers to a greater extent than the Coast Guard and that the Coast Guard's task would be extremely difficult if it is denied the ability to conduct warrantless searches on suspicion less than probable cause. By drawing erroneous conclusions from *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), which involved only a border search, the majority conclude also that the first Congress authorized random interception and search of vessels on the high seas, and that their denigration of the amendment in such matters has the sanction of history.

None of that explanation provides sufficient reason to depart from the extensive jurisprudence of the last six decades interpreting the fourth amendment. I would hold that the seizure and search of vessels on the high seas is governed by the same principles as the stopping and searching of automobiles, planes and other vehicles. The shield against unreasonable searches does not rust on exposure to salt air and it is unreasonable to *search* a vessel, foreign or domestic, on international waters, absent probable cause and exigent circumstances.

The sea coast of our nation cannot be regarded as creating a unique problem warranting a singular constitutional interpretation.[4] *See United States v. Warren*, 578 F.2d 1058, 1080–84 (5th Cir. 1978) (en banc) (Fay, J., dissenting). *See generally* 3 W. LaFave, Search and Seizure § 10–8(f) (Supp.1980); Note, High on the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea, 93 Harv.L. Rev. 725 (1980). Most of the nation's 3,987 miles of border with Canada are unpatrolled and unmarked. Our border with

Mexico stretches 2,013 miles; it is marked and patrolled to some extent, but we all know that literally millions of persons have crossed it undetected. Airplanes may enter our territory from any point of the compass and from any elevation. The Constitution is not to be interpreted in the alternative like the signals for *Paul Revere's Ride*: "one, if by land, and two, if by sea."

## II. APPLYING ESTABLISHED RULES

The fourth amendment prohibition of unreasonable searches and seizures means simply that, without proper consent, the government may neither seize nor search private property unless there is probable cause for the action. Probable cause alone, however, does not suffice. There must also be a warrant or exigent circumstances. There are exceptions to these general principles, but these exceptions are limited and "carefully defined." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). This established doctrine can be applied easily to offshore waters. *See, e. g., United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927) (deriving rules permitting an American vessel on high seas to be seized and searched by Coast Guard from rules that permit a vehicle on land to be seized and searched by prohibition officers).

### A. BORDER SEARCHES-THE THREE—MILE LIMIT AND THE CONTIGUOUS ZONE

Searches of persons or vehicles crossing our international boundary "are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977). A border search need not be conducted at the literal bound-

---

*Warren* had left doubtful whether the fourth amendment reached beyond our coast. Not until the opinion in *United States v. Cadena*, 585 F.2d 1252 (5th Cir. 1978) did this court unequivocally find that scope. One of the apparent purposes of the majority opinion, *see* n. 10, is to disavow *Cadena*'s statement that the fourth amendment applies alike on land and sea.

4. Conceding that law enforcement problems may be greater on sea than on land, privacy interests likewise may be more substantial. As I previously have observed, "[t]he ship is the sailor's home. There is hardly the expectation of privacy even in the curtained limousine or the stereo-equipped van that every mariner or yachtsman expects aboard his vessel." *United States v. Cadena*, 588 F.2d 100, 101 (5th Cir. 1979).

ary of United States territory; it may be made at a place that is the functional equivalent of the border, for example, at the place where a ship docks in this country after having been to a foreign port, *United States v. Prince*, 491 F.2d 655 (5th Cir. 1974), at any airport in the country, however far inland, where international flights land, *United States v. Ivey*, 546 F.2d 139 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974), and at established stations near both a border and the confluence of two or more roads that extend from it, *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). If it is demonstrated with reasonable certainty that a vehicle has crossed the border and that any contraband found at the time of the search was aboard it at the time it entered United States jurisdiction, a search of that vehicle made inland from the border qualifies as a border-type search. *See United States v. Flores*, 594 F.2d 438 (5th Cir. 1979); *United States v. Martinez*, 577 F.2d 960 (5th Cir.), *cert. denied*, 439 U.S. 914, 99 S.Ct. 288, 58 L.Ed.2d 262 (1978); *United States v. Anderson*, 509 F.2d 724 (9th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975).[5]

Once a vessel approaching the United States enters the three-mile limit, however invisible that line may be, it has crossed our border. It may be searched. Although the contiguous zone extends seaward rather than landward from the three-mile limit, it should be considered the functional equivalent of the border. Land beyond our borders has not been regarded as the functional equivalent of the border for this would encroach on another sovereign's domain; however, the nature of the seas and the historic policy differentiations between the contiguous waters and international waters warrants the extension of border search analysis to the contiguous zone for fourth amendment purposes.[6]

Because there are no fixed points of entry along our coastal boundaries, searches within the twelve-mile limit are reasonable means to enforce the sovereign's power to protect its borders. Moreover, limited to searches of vessels in the contiguous zone and bound for the United States, the subjective intrusion on those who enter such an area would be minimized by the historical acknowledgment that the contiguous zone is the proper place to apprehend and examine United States-bound vessels.[7]

## B. ADMINISTRATIVE STOPS

Some governmental administrative and investigatory investigations that are less intrusive than a search constitute another exception to the probable-cause-*cum*-exigency-or-warrant rules. A limited search for weapons, the stop and frisk, is reasonable if there is reasonable suspicion of crimi-

5. This circuit, however, has generally permitted searches of a vehicle that was known to have crossed the border even when the searching officials could not be certain that nothing had been added to the vehicle after the border crossing if there was some suspicion of smuggling. *See* 3 W. LaFave, Search and Seizure § 10.5, at 298–99 n. 115 (1978). *See also* Note, From Bags to Body Cavities: The Law of Border Search, 74 Colum.L.Rev. 53, 59–61 (1974).

We have also held that, if there is a likelihood that a vehicle recently traveled beyond the border, reasonable suspicion justifies its search. *United States v. Steinkoenig*, 487 F.2d 225 (5th Cir. 1973). Other Fifth Circuit cases reaching the same result are discussed in Note, *supra*, 74 Colum.L.Rev. 53, 66–67 (1974).

6. If, for example, by treaty the United States and a foreign government agree that passengers enplaning for the United States might be subjected to customs inspection at the point of boarding, there would appear to be no constitutional injunction against considering the custom station on foreign soil as the border's functional equivalent.

7. The recognition that the contiguous zone is a proper place for border protection is longstanding. *See Maul v. United States*, 274 U.S. 501, 525–29, 47 S.Ct. 735, 744–45, 47 L.Ed. 735 (1927), (Brandeis, J., concurring); *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804). *See, e. g.*, Act of August 4, 1790, ch. 35, §§ 31, 48, 1 Stat. 145, 164, 170 (1790) (authorizes searches in port and within four leagues of coast if vessel bound for U. S.). *See generally* Note, High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea, 93 Harv.L.Rev. 725, 734–36 (1980).

nal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Roving patrols near a border may, on reasonable suspicion of law violation, stop vehicles briefly and investigate the circumstances that provoke suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Even without the focus of suspicion, vehicles may be stopped and the occupants may be briefly questioned at fixed checkpoints established to prevent border violations, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), although routine random *searches* at such checkpoints are not permissible, *see United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

Absent border-crossing connexity, vehicles may be stopped for administrative and regulatory checks, without either reasonable suspicion or probable cause, if pursuant to plan and not on a random basis imparting discretion that might be abused to indi-vidual law enforcement officers. *See Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). *See also id.* at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 676 (Blackmun, J., concurring). After a vehicle, land, air, or sea-borne, is stopped for administrative purposes, law enforcement officers may intrude further by entering the vehicle to pursue the same regulatory inquiry.

Therefore, if a vessel, foreign or domestic, is approaching our shores,[8] even though it still be on international waters, the government may stop the vessel, examine its documents and make a limited inquiry to determine its registry and the legitimacy of its mission, but only for the purpose of and to the extent reasonably appropriate to ascertaining that the vessel is properly registered, or, in the case of a domestic vessel, in compliance with safety laws.[9] If such stops are left to the discretion of the law officer, reasonable suspicion that the vessel is violating some law is required. If, in the

---

**8.** Neither the majority nor I think it appropriate to consider the validity of stopping vessels departing from the United States or navigating international waters without any apparent intention of entering the United States or engaging in any activity that might concern it.

**9.** In *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc), we held that such a stopping and boarding "need not be founded on any particularized suspicion." As Professor LaFave has pointed out, the proposition was advanced in conclusory terms. In neither *Warren* nor its predecessors is there "an effort to develop in a systematic fashion a line of analysis which explains just how that result can be squared with extant Supreme Court decisions on analogous situations.

"Whether this branch of *Warren* can be squared with the Supreme Court's holdings on similar issues is in serious doubt. As we have previously seen, one theme which runs through the Court's rulings in this area is that whenever possible the decision to make administrative seizures or searches should not be left in the unbridled discretion of officers in the field. Thus, the Court has declined to permit other warrantless random inspections for safety purposes, whether directed at residential premises, *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), business premises, *Marshall v. Barlow's*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), or automobiles, *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), or for docu-mentation purposes, whether to establish citizenship, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), or the presence of a driver's license and vehicle registration. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). . . .

"It is certainly not fanciful to suggest that the *Prouse* decision casts a rather heavy cloud over the Fifth Circuit's rulings that Coast Guard inspections may be conducted purely at random. But *Prouse* only builds upon the Court's earlier decisions, and thus it is not surprising that even before that ruling some authority contrary to *Warren* was to be found." 3 W. LaFave *supra* note 5, § 10.8(f) at 39 (Supp.1980).

As was pointed out by Judge Fay, dissenting in *Warren*, the search in that case "included going through all areas of the boat, opening closets, cabinets, drawers, and even going through personal items such as one of the defendant's shaving kits." 578 F.2d at 1084 (Fay, J., dissenting.) However "cursory" such a search might be, it is impermissible unless the intrusion is justified by the limited purpose of safety and document inspection. *See* Warren, 578 F.2d at 1078 (Roney, J., dissenting) ("there is no constitutional exception for 'cursory' searches"). Thus, not only does *Delaware v. Prouse* mandate that safety and document inspections be undertaken pursuant to some plan that limits their random quality, but also that the purpose of such inspections restricts the type of intrusion that can be justified by the necessity for making them.

course of such an inspection, reasonable suspicion of smuggling or other illegal activities arises, the officer may "investigate the circumstances that provoke suspicion. . . [H]e may question [the vessel's occupants] . . . , and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975).

## C. TERRITORIAL WATERS

If a vessel is within the territorial or the inland waters, and the evidence does not warrant the conclusion with reasonable certainty that there has been a border crossing, it may not be searched without probable-cause-*cum*-exigency-or-warrant. In these waters, however, the government may make the lesser intrusion of stopping and boarding the vessel for administrative inspection on the principles discussed above.

## D. HIGH SEAS [10]

Unless the stop and subsequent action is justified administratively on the principles set forth above, no vessel, foreign or domestic, may be searched while it is on waters outside the contiguous zone, that is, beyond

**10.** The early customs and Coast Guard statute cited by the majority do not appear to me to support the proposition that any high seas search is reasonable. The first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29, authorized searches of vessels by customs officers only when they had "reason to suspect" that dutiable goods were concealed aboard the vessel. I cannot so easily read the limiting language "reason to suspect" out of the statute as the majority chooses to do. *Cf.* N. Lasson, History and Development of the Fourth Amendment 54 ·n.17, 67 n.57, 71–72 (1937) (portraying use of general writs of assistance in custom searches of vessels as factor contributing to American Revolution). Moreover, it is not certain that the Congress intended that statute to apply to searches outside of port.

Since the Revenue Cutter Service, the forerunner of the Coast Guard, had not yet been authorized, and the Congress may have believed the searches it authorized would occur at places where ships were landing, such searches would easily fit into a boarder search rationale. Lending support to this analysis is the Congressional authorization, one year later, of the Revenue Cutter Service, Act of August 4, 1790, ch. 35, §§ 31, 48, 1 Stat. 145, 164, 170 (1790). That Act, entitled "An Act to Provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels" was directed at customs problems and clarified the Congress's early view of the power of the United States to combat those problems. It provided a new authorization for agents to board and search ships "in any [port] of the United States, or within four leagues [the contiguous zone and territorial waters] of the coast thereof, if bound to the United States." Even if it is not possible to assume that searches pursuant to the earlier act would have occurred solely in port, the reenactment of the search provisions of that act as § 48 of the 1790 Act suggests that the "reason to suspect" language had meaning. Otherwise, the broader § 48 would completely supercede the limita-

tions to searches in port or within four leagues of the coast contained in the new § 31.

In any event, neither of these early search authorizations requires the conclusion that early Congresses were wont to suspend the fourth amendment in customs matters. Indeed, the limitations in both statutes fit them into current fourth amendment jurisprudence. The authorization of searches upon "reason to suspect" may be explained either as a border search, when a vessel is in port, or as a search with probable cause plus exigent circumstances, when the vessel is in international waters (assuming Congress even intended to permit such searches). The authorization for searches in the territorial and contiguous waters, both limited to vessels bound for the United States, fits fairly into a border search analysis that treats the contiguous zone and territorial waters as functional equivalents of the border. In modern times, the proliferation of pleasure vessels makes the question of searches of vessels within the territorial waters more difficult, since those vessels may never have crossed the border; however, that does not alter the analysis of the early customs statutes, it merely requires that fourth amendment analysis of searches in the territorial waters today be more carefully defined and congressional statutes more narrowly formulated than they were in 1789 and 1790.

Freedom of American vessels from foreign stopping and boarding was a cardinal principle of our early foreign policy. The war of 1812 was fought in large part to vindicate it. *See* Madison's War Message (June 1, 1812), *reprinted in* H. Commager, *Documents of American History* 207 (7th ed. 1963); *see generally* H. Wish, Contemporary America 192–93 (4th Ed. 1966). Viewed in historical context as well as in literal terms, the statutes cited by the majority do not, in my view, support the proposition that the framers of the Constitution viewed any search on the high seas as constitutionally permissible. *See e. g. Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804) (some limit-

the twelve-mile limit, without probable cause and exigent circumstances.[11] It is as unconstitutional for government officials to search such a vessel as it would be, even with the consent of a foreign government, to intercept mail destined for the United States before it arrives or to abridge constitutional rights on foreign soil, see Raffel, Searches and Seizures Abroad in the Federal Courts, 38 Md.L.Rev. 689 (1979); see also Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Powell v. Zuckert, 366 F.2d 634 (D.C.Cir. 1966).

In most cases, probable cause alone would in fact suffice, for the location and nature of a vessel usually make circumstances exigent: there is the evident possibility that evidence might be jettisoned or that, even though under Coast Guard guns, an attempt might be made to flee. Absent these or a warrant, the fourth amendment is violated if a vessel is searched on the high seas.[12] My brethren balk at the mention of a warrant on the basis that Congress has not authorized issuance of a warrant on the

high seas. Yet they hesitate, too, to assert that a warrantless search may be made of private places, and they do not inquire into the source of the warrant to search cabins and footlockers. I do not view the procedural provisions of the Federal Rules of Criminal Procedure as limiting the inherent powers of United States courts to issue warrants. See Raffel, supra at 712; United States v. New York Telephone Co., 434 U.S. 159, 168 n. 14, 98 S.Ct. 364, 370 n. 14, 54 L.Ed.2d 376 (1977).

Our Fifth Circuit precedents are erratic because we have not carefully steered the constitutional course. When a case or controversy requires application of fourth amendment principles to vessels off our shore, established constitutional rubric makes our way clear and provides the correct means to clear our fuzzy precedents.

R. LANIER ANDERSON, Circuit Judge, specially concurring:

I concur in the result reached by the majority, but for different reasons. I find

---

ed right to search foreign vessels may be exercised up to four leagues from coast.) The limitations placed on such searches were too clearly defined for that. However, they do support the proposition that vessels bound for the United States which cross the contiguous zone or territorial waters may be treated as though they had crossed a border. Historically, those areas of the sea have been recognized as border equivalents. See supra note 7.

It is hardly necessary to point out that, in 1789, the protection of the fourth amendment was largely limited to a person's home and the curtilage and that both the areas protected and the scope of reasonable expectation of privacy have since been vastly extended. We cannot disregard all of the fourth amendment decisions of the last 60 years to adopt on the offshore waters the interpretation the fourth amendment might have been given in 1789.

11. International law will in some cases require modification of the right of law enforcement officers to stop, board or search foreign vessels. This does not, however, affect the scope of the fourth amendment. Foreign vessels are subject to the right of approach, that is the right of United States vessels to stop the foreign vessel merely to verify its flag. See, e. g., The Marianna Flora, 24 U.S. (11 Wheat) 1, 43, 6 L.Ed. 405, 415 (1826); United States v. Cortes, 588 F.2d 106, 110 (5 Cir. 1979). This is analogous to determining whether a United States registry vessel is properly documented or an automobile is properly displaying license plates

or a plane is registered. The right of approach, however, does not permit an examination of persons aboard the vessel or a search of the vessel.

12. The majority express no opinion concerning what is required to justify search of "private areas" in a vessel. If there is a distinction, it can be drawn only on the basis of reasonable expectation of privacy. Therefore, I do not understand the reservation. If the party who objects to the search has no reasonable expectation that cargo in the hold is private, he has no standing to suppress the use of that cargo as evidence. If he has a reasonable expectation of privacy and, therefore, standing to contest the validity of the search, then the failure to consider the validity of a search of his cabin or footlocker must be on the basis of a greater expectation of privacy there. It does not seem to me that we are justified in ranking these expectations.

The other possibility is that the reservation is based on the greater reasonableness per se of searching the hold of a vessel. If this is a proper interpretation of this part of the majority opinion, it leads to the inquiry whether the necessary search warrant can be obtained for the more intrusive search of private areas, a question that the majority find answerable only by assuming that a warrant is never required. I do not think the Constitution is measured by whether Congress has provided a valid way to comply with it.

that the actions of the Coast Guard in this case were authorized by § 89(a) and by Panama's consent. I find no Fourth Amendment violation because there was probable cause to stop, board, and search the vessel, and· because the circumstances were exigent. I, therefore, do not reach the other issues discussed by my brothers.